## THE STATE OF KANSAS v. M. E. MATTHEWS.

1. FALSE PRETENSES, *Obtaining Money by — Charge, When Sustained.* The charge of committing the offense of obtaining money or property under false pretenses cannot be maintained in any case unless it appears not only that a false pretense was in fact made, but also that it was made with the intention of cheating or defrauding some person, and that such person was in fact cheated or defrauded to his or her injury.

2. DEED — *Substituted Grantee — Fraud — Notice.* Where a deed of conveyance of real estate, perfect in form except that the grantee's name is left blank, is duly executed and acknowledged, and afterward the blank is filled contrary to the instructions of the grantor and to his or her injury with the name of a person not intended by the grantor to be the grantee, and with full knowledge on the part of such substituted grantee, *held,* that the deed is void as to such substituted grantee or as to anyone with notice of the fraud.

3. FRAUDULENT GRANTEE — *Valid Mortgage.* But afterward such deed is recorded, and then the substituted and fraudulent grantee procures a loan of money from an innocent person, and executes a mortgage on the property conveyed by the deed, and such innocent person loans the money on the strength of such deed and of the false pretenses made by such grantee that he had purchased the real estate conveyed by the deed, and that he was then the owner thereof in fee: *Held,* That the mortgage will be held to be valid.

4. LOSS — *Who to Suffer.* Whenever one of two innocent persons must suffer loss on account of the wrongful acts of a third, he who has enabled the third person to occasion the loss must be the person who shall suffer.

5. ———— *No Conviction, When.* Where such substituted and fraudulent grantee is afterward prosecuted criminally for obtaining the money from such innocent person upon the false pretenses that he had purchased the real estate conveyed by the deed and that he was then the owner thereof in fee, *held,* that the defendant cannot be legally convicted, for the reason that under the circumstances he did not and could not cheat or defraud the innocent mortgagee or person who loaned him the money.

*Appeal from Shawnee District Court.*

THIS was a criminal prosecution upon an information containing two counts, in which the defendant, M. E. Matthews, was charged with obtaining a check and signature and money

upon false pretenses. A trial was had before the court and a jury, and at the close of the evidence for the state the prosecution elected to rely for a conviction upon the second count of the information, and entered a *nolle prosequi* as to the first count. The aforesaid second count, omitting title and signature, reads as follows:

"And in the name and by the authority of the state of Kansas, I, R. B. Welch, county attorney in and for the county of Shawnee, in the state of Kansas, who prosecute for and on behalf of said state, in the district court sitting in and for the county of Shawnee, and duly empowered to inform of offenses committed within said county of Shawnee, come now here and give the court to further understand and be informed, that M. E. Matthews, late of the said county of Shawnee, at the county of Shawnee in the state of Kansas aforesaid, and within the jurisdiction of said court, on the 29th day of November, 1887, then and there being, and then and there intending and devising to cheat and defraud one Jonathan Thomas, did then and there knowingly, unlawfully, fraudulently, feloniously, falsely and designedly pretend and represent to said Jonathan Thomas, that he, the said M. E. Matthews, had bought of Mary J. Wallace the undivided one-fifth interest in the following-described real estate, to wit: The northwest quarter of section number 20, in township number 11 south, of range number 15, east of the sixth principal meridian, situated in Shawnee county, state of Kansas, and that he was the owner in fee of the same; whereas, in truth and in fact, he, the said M. E. Matthews, had not bought of Mary J. Wallace the undivided one-fifth interest in the said real estate, and he, the said M. E. Matthews, was not the owner in fee of the same, as he, the said M. E. Matthews, then and there well knew, and said M. E. Matthews well knew that each and all of said representations and pretenses were false and fraudulent, and without foundation in fact. And said M. E. Matthews then and there requested of the said Jonathan Thomas a loan of money, and the said Jonathan Thomas then and there believing and relying upon said pretenses and representations as true, the said M. E. Matthews then and there, and by the said false pretenses, designedly made as aforesaid, designedly, fraudulently and feloniously obtained from said Jonathan Thomas an order, and the signature of the said Jonathan Thomas by the name of 'J. Thomas,'

to said order, whereby the said Jonathan Thomas, by the name of 'J. Thomas,' requested and ordered the Citizens' Bank of Topeka, Kansas, to pay to the said M. E. Matthews, or order, the sum of $382, which said order was in the following words and figures, and of which the following is a copy, to wit:

"'No. —.        NORTH TOPEKA, KAS., November 29, 1887.
"'Citizens' Bank, pay to M. E. Matthews or order, three hundred and eighty-two dollars.        J. THOMAS.'
    $382.

"Which said order so as aforesaid obtained was then and there of the value of $382, and was the personal property of said Jonathan Thomas; that the said Citizens' Bank was then and there a corporation duly organized and existing under and by virtue of the laws of the state of Kansas; and said M. E. Matthews on the same day took said order to said Citizens' Bank, and indorsed and surrendered the same to said bank, and received from said bank the sum of $382 in current money, of the value of $382, the personal property of said Jonathan Thomas; and all of this the said M. E. Matthews did designedly, knowingly, fraudulently and feloniously, for the purpose and with the design to cheat and defraud the said Jonathan Thomas; contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the state of Kansas."

The first count was substantially the same as the second count, except that it alleged that Jonathan Thomas acted as the agent of Louisa Havens in loaning the money, that the money loaned belonged to her, and that it was she whom Matthews intended to and did cheat and defraud. There are also some other allegations in the first count which were not included in the second count, to wit: Allegations concerning an abstract of title and a note and mortgage executed by Matthews to Havens as evidence of and security for the aforesaid loan. The defendant was found guilty, and sentenced to imprisonment in the penitentiary for the term of two years; and he now appeals to this court.

*Wm. P. Douthitt, Z. T. Hazen,* and *W. C. Webb,* for appellant.

*L. B. Kellogg,* attorney general, and *R. B. Welch,* county attorney, for The State.

The opinion of the court was delivered by

VALENTINE, J.: The principal facts involved in this case, as the evidence on the part of the prosecution tended to show, and as was evidently found by the trial court and the jury, stated briefly, are substantially as follows: Prior to 1886 A. C. Wallace died intestate, leaving as his heirs his widow, Phœbe J. Wallace, and two children, Mary J. Wallace and Phineas Wallace, and also leaving real and personal property. Afterward, and on July 15, 1886, the widow, Phœbe J. Wallace, died intestate, leaving as her heirs five children, Mary J. Wallace, Phineas Wallace, Jonathan W. Blossom, David Blossom and a daughter, the last three being children by a former husband; and she also left real and personal property. Mary J. Wallace had a claim against her mother's estate of $800, which was contested, but which was allowed to her by the probate court on October 28, 1886. She also desired to have both the estates settled, and to have all her interest therein separated from the interests of the other heirs, by partition or otherwise; and for this and other reasons she employed the defendant, M. E. Matthews, who was an attorney at law, to assist her in her business. On November 14, 1887, Matthews wrote and sent to her a letter requesting her to call that day at his office, at 10 or 11 o'clock. She did not receive the letter in time to call at that time, but called the next day, when she was told by him to call on the 16th, and that he would then tell her what he wanted. On the 16th she again called, and he stated to her that on the day on which he sent for her Jonathan W. Blossom, Phineas Wallace, and David Overmyer, another attorney at law, had been at his office, waiting for her, and proposed to buy her interest in the land belonging to her mother's estate, except the Harrison street property; but that she did not come, and that they were compelled to go away; and that they had left a deed, perfect in form in every respect, except that the grantee's name therein was left blank, for her to execute if she would accept their proposition; and that the blank was to be filled so as

to make it a deed to one of her half-brothers, either Jonathan W. Blossom or David Blossom, for which they would pay her $2,500. After some talk about the price, and to save litigation, she agreed to execute the deed for the said sum of $2,500, and it was agreed between her attorney, the defendant, and herself, that if the transaction should be consummated, the name of her half-brother should be inserted in the deed and the deed should then, on the payment of the $2,500, be delivered to such grantee; but that if neither of her half-brothers should take her interest at that price, then the deed was to be destroyed. With this understanding she signed and acknowledged the deed, blank as aforesaid, and left the same with the defendant, Matthews. Afterward, Matthews filled up the blank in the deed with his own name as grantee, and afterward, and on November 29, 1887, deposited such deed in the office of the register of deeds for record, and then procured an abstract of title showing that Mary J. Wallace's interest in the land had been transferred to himself, and that he was then the owner in fee thereof; and he then went to Jonathan Thomas, who carried on the business of loaning money for himself and others, and sought to procure a loan from Thomas, and offered to secure the loan by mortgaging the aforesaid property, and he showed to Thomas the aforesaid abstract of title showing title in himself, and he represented to Thomas that he had purchased the interest of Mary J. Wallace in the aforesaid estate, and that he owned the same in fee. Thomas at the time had authority to loan $400 in money for Louisa Havens, and he concluded to make the loan to Matthews upon the aforesaid security. He therefore accepted from Matthews a promissory note, executed by Matthews to Louisa Havens for that amount, and also accepted from Matthews a mortgage of the foregoing real-estate interest of Mary J. Wallace, executed by Matthews to Louisa Havens to secure the loan. But Thomas, at the time, not having that amount of money on hand belonging to Louisa Havens, advanced the same out of his own money. He charged Matthews $18 for consummating the loan, and then delivered to Matthews a check on the

Citizens' Bank of North Topeka for $382, and Matthews presented the check to the bank and drew the money it called for on the same day.    The check reads as follows:

"No. ——.        NORTH TOPEKA, KAS., Nov. 29, 1887.
"Citizens' Bank, pay to M. E. Matthews or order, three hundred and eighty-two dollars ( $382.00).    J. THOMAS."

The defendant, Matthews, testified as a witness in the court below, and testified to a different state of facts from those above given, but evidently the court and jury did not believe him.

We shall decide this case upon the theory that the defendant, Matthews, in fact made the aforesaid statements to Mary J. Wallace which the state claims he made concerning the alleged statements made to him by her brother, half-brother, and Overmyer about purchasing her interest in the Wallace estate, and concerning their leaving the blank deed with him for her to execute so as to make it a deed to one of her half-brothers, but that all such statements and representations of Matthews were false and fraudulent; that at the time when he made the statements to Mary J. Wallace, and when the blank deed was signed and acknowledged by her, he intended to cheat and defraud her, and intended to fill up the deed so as to make it a deed to himself for the property, and that by making the statements and procuring the deed and filling up the blank so as to make it a deed to himself, he himself at that time committed a crime.    And we shall also decide the case upon the theory that when he represented and pretended to Jonathan Thomas that he had purchased the aforesaid interest of Mary J. Wallace in the Wallace estate and that he was then the owner thereof in fee, he well knew that his representations and pretensions were false and fraudulent, and that he thereby intended to cheat and defraud some person; but the questions then arise, whom did he intend to cheat and defraud, and who was in fact cheated and defrauded ?

The defendant was in fact tried only upon the second count of the information, as a *nolle prosequi* was entered as to the other count before he was called upon to introduce any evi-

dence; and in this second count upon which he was tried the only false pretenses alleged were and are as follows: " He, the said Matthews, had bought of Mary J. Wallace the undivided one-fifth interest in the following-described real estate, to wit [and here follows a description of the property]; and that he was the owner in fee of the same." It is also alleged in the said second count that these false pretenses were made to Jonathan Thomas and for the purpose of cheating and defrauding him, and there is no allegation in such count that such false pretenses were made to anyone else or for the purpose or with the intention of cheating or defrauding anyone else. It is not alleged that any false pretense was made to Mary J. Wallace or to Louisa Havens; nor is it alleged that either Mary J. Wallace or Louisa Havens was cheated or defrauded or intended to be cheated or defrauded; hence the only ques-· tions presented to us for consideration are, whether the false pretenses made to Jonathan Thomas were made with the intention of cheating or defrauding him, and whether by means thereof he was in fact cheated or defrauded.

As before stated, we shall decide this case upon the theory that all the false pretenses alleged in the information, or which the evidence tended to prove, were in fact made; but still the questions remain to be considered as to whether they were in fact made for the purpose of cheating or defrauding Jonathan Thomas, and whether he was in fact cheated or defrauded by them. The charge of committing the offense of obtaining money or property under false pretenses cannot be maintained in any case unless it appears, not only that a false pretense was in fact made, but also that it was made with the intention of cheating or defrauding some person, and that such person was in fact cheated or defrauded to his or her injury. These are elementary principles and really require no citation of authorities, but still we might refer to the following cases as instructive: *In re Snyder,* 17 Kas. 542; *In re Payson,* 23 id. 757; *The State v. Lewis,* 26 id. 123; *The State v. Metsch,* 37 id. 222; *In re Schurman,* 40 id. 533; *In re Cameron, Petitioner,*

1. False pretenses, obtaining money by—charge, when sustained.

ante, p. 64; same case, 24 Pac. Rep. 90; *The State v. Asher,*
50 Ark. 427; *The People v. Wakely,* 62 Mich. 297; same
case, 8 Crim. Law Mag. 322. In the case last cited the fol-
lowing language is used by the court:

"The object of the statute is to punish cheats, and it must
be made to appear, not only that some person has been de-
frauded, but that the person making the representations in-
tended to defraud the person by the representations made.
. . . It is true that there need be but one false pretense,
and though several are set out in the information, yet if any
of them are proved which amount in law to a false pretense,
the information is sustained. But it does not amount in law
to a false pretense unless made with a fraudulent intent, and
the person parting with the property *is actually defrauded.*

"In all cases of this kind three things, at least, must concur:
the intent to defraud, the false pretense made with the intent,
and the fraud accomplished." (See 62 Mich. 302, 303.)

Was Jonathan Thomas cheated or defrauded? He received
from Matthews a promissory note and a mortgage executed
by Matthews to Louisa Havens, which were all that he desired
or expected to receive. Of course, however, he expected the
note and mortgage to be legal and valid; and if they were not,
then he may have been cheated and defrauded; but if they
were, then he was not cheated or defrauded. Were they legal
and valid? As to Matthews they were undoubtedly unim-
peachable instruments, and could unquestionably be enforced
against him as such. In fact, the note was and is an abso-
lutely valid note as to all the world; but is the mortgage a
valid instrument? This is really the only material question
in the case. We suppose that it will be conceded by all that
a deed, or mortgage, or any other instrument affecting real es-
tate, where the name of the grantee, mortgagee or vendee is
left blank, is void, so long as such blank remains. Some
courts hold that if the instrument is afterward filled up in
accordance with the directions of the maker, it is valid,
whether it is filled up in his presence or absence, whether be-
fore or after its delivery, whether such directions are in writ-
ing or only in parol, and whether with or without the

knowledge of the party holding under the instrument; but other courts hold otherwise. Upon these questions the decisions of the courts are not uniform. We believe, however, that all the courts hold that if the instrument is filled up contrary to the directions of the maker and to his injury, and with full knowledge on the part of the party who takes and holds under it, the instrument will be held to be absolutely null and void as to him. (*Ayers v. Probasco*, 14 Kas. 175; *Schintz v. McManamy*, 33 Wis. 299; *Upton v. Archer*, 41 Cal. 85. See also the following: *Drury v. Foster*, 2 Wall. 24; *Whitaker v. Miller*, 83 Ill. 381; *Simms v. Hervey*, 19 Iowa, 274.) On the other hand, however, it is generally held that if the instrument is filled up in accordance with the instructions, written or oral, of the maker, in his presence or absence, before or after its delivery, and under it the property at that time or afterward comes into the hands of some innocent and *bona fide* holder for value, the instrument will be held to be valid. (*Knaggs v. Mastin*, 9 Kas. 532; *Chapman v. Veach*, 32 id. 167; *McClain v. McClain*, 52 Iowa, 272; *Field v. Stagg*, 52 Mo. 534; *Raggsdale v. Robinson*, 48 Tex. 380; *Van Etta v. Evenson*, 28 Wis. 33; *Schintz v. McManamy*, 33 id. 299; *Pence v. Arbuckle*, 22 Minn. 417.) But none of the foregoing cases is the present case. In the present case the directions of the maker with reference to filling the blank were oral, the instrument was filled up in the absence of the maker and not in accordance with but contrary to her directions, and to her injury; but the parties now claiming benefits under it, Louisa Havens and Jonathan Thomas, (she having acted through her agent, Jonathan Thomas, and he having acted personally and for her,) acted innocently and in good faith, and without the slightest knowledge of Matthews's fraud or of the imperfections or infirmities of the instrument when it left the hands of the maker, Mary J. Wallace, and they parted with value on the strength of the instrument as it appeared when they or either of them first saw it, and as the maker, Mary J. Wallace, and her

*2. Deed—substituted grantee—fraud—notice.*

*3. Fraudulent grantee—valid mortgage.*

agent Matthews, made it to appear. In all such cases the weight of authority is that the instrument will be held to be valid to the extent of the innocent party's rights under it, or the rights which he or she would have under it if it were valid. (*Chapman v. Veach*, 32 Kas. 167; *Pence v. Arbuckle*, 22 Minn. 417; *Garland v. Wells*, 15 Neb. 298; *Clark v. Allen*, 34 Iowa, 190; *Swarts v. Ballou*, 47 id. 188.) This is founded upon the general principle of law often announced by courts, and which has become axiomatic, "That whenever one of two innocent persons must suffer loss on account of the wrongful acts of a third, he who has enabled the third person to occasion the loss must be the person who shall suffer." (*Jordan v. McNeil*, 25 Kas. 465; 2 Herman, Estop., §§ 766, 767, and the numerous cases there cited.) Upon this same principle it is almost universally held that whenever an instrument is procured from one person by the fraud or villainy of another, even if such fraud or villainy should amount to a criminal offense, if all the rights which the instrument apparently gives should at that time or afterward be transferred to another who should be an innocent and *bona fide* holder for value, the innocent and *bona fide* holder could enforce the instrument against the maker, although the maker might also be an innocent person. (*Jordan v. McNeil*, 25 Kas. 459; *McNeil v. Jordan*, 28 id. 7; *Ort v. Fowler*, 31 id. 478; *Chapman v. Veach*, 32 id. 167; *McNab v. Young*, 81 Ill. 12; *Tisher v. Beckwith*, 30 Wis. 55.) In such a case the maker would be estopped from claiming that the instrument was void as against the innocent *bona fide* holder. There may be some authorities that hold a contrary doctrine; but if so, we do not choose to follow them. The prosecution cites, among others, the following: *Ayers v. Probasco*, 14 Kas. 175; *Howell v. McCrie*, 36 id. 636; *Drury v. Foster*, 2 Wall. 24; *Whitaker v. Miller*, 83 Ill. 381; *Upton v. Archer*, 41 Cal. 85; *Tisher v. Beckwith*, 30 Wis. 55; *Taylor v. Davis*, 72 Mo. 291; *Simms v. Hervey*, 19 Iowa, 274; *Wilcox v. Howell*, 44 N. Y. 398. While it is possible that some of these authorities are to some extent in conflict with the views herein expressed,

*4. Loss—who to suffer.*

yet generally we think they are not in conflict, but are in harmony therewith.

Returning to the alleged false pretenses made by Matthews to Jonathan Thomas, it is clear that if the statements and representations made by Matthews were true and not false, Matthews should not be convicted; but, as before stated, we shall assume that all such statements and representations were false. Then if Jonathan Thomas knew that they were false, or in other words if he knew just how Matthews obtained the aforesaid blank deed from Mary J. Wallace, and just how the blank in the deed was filled up by Matthews so as to make the deed appear to be a perfect deed to himself, then Jonathan Thomas was not cheated or defrauded, and the defendant should not be convicted. But these are not the real facts of the case. Thomas did not have the slightest knowledge or suspicion concerning Matthews's fraud, and neither did Louisa Havens; probably she never saw or heard of Matthews until after the mortgage from him to her was executed. Thomas and Louisa Havens being innocent parties, they obtained all that they expected to obtain, and were

5. No conviction, when. therefore not cheated or defrauded, and therefore and for that reason the defendant, Matthews, could not legally be found guilty. The defendant's counsel in their brief upon this subject use the following among other language:

"Now we repeat, that the only person injured and defrauded in any respect, if the facts were and are precisely as claimed by the state, was Mary J. Wallace. Whether an information could be framed in proper and apt terms to charge false and fraudulent representations made to Thomas for the purpose of securing a loan of money from him, with intent to cheat and defraud Mary J. Wallace, is a question we need not discuss here. But it is plain beyond possibility of doubt, that upon the facts as proven by the state, defendant never had any 'intent to cheat and defraud Louisa Havens,' nor any intent 'to cheat and defraud Jonathan Thomas'; because as to them or to either of them, the note and mortgage executed by him were and are perfect security for the money obtained, and he knew it. The record does not disclose a single word

of testimony showing an 'intent on the part of the defendant to cheat or defraud Jonathan Thomas'—no proof that Thomas was in any respect cheated, defrauded, or injured—no evidence showing or tending to show that Thomas could in anywise be cheated or defrauded out of money loaned by him to defendant or paid to defendant upon the order which he received from Thomas on account of that loan."

Therefore it is urged by the defendant's counsel that he cannot legally be found guilty of any criminal offense in this case.

There are many other questions discussed in the briefs of counsel, but with the views which we entertain and which we have already expressed, we do not think that further comment is necessary. In our opinion the defendant was erroneously convicted and sentenced, and therefore the judgment of the court below will be reversed.

All the Justices concurring.