STATE OF KANSAS, *Appellee/Cross-Appellant*, v. RICHARD M. RIOS, *Appellant/Cross-Appellee*.

No. 62,478

STATE OF KANSAS, *Appellee/Cross-Appellant*, v. WILLIAM S. JOHN-SON, *Appellant/Cross-Appellee*.

(792 P.2d 1065)

Opinion filed May 25, 1990.

*Geary N. Gorup*, of The Law Offices of Leslie F. Hulnick, P.A., of Wichita, argued the cause, and *Leslie F. Hulnick*, of the same firm, was with him on the briefs for appellant/cross-appellee Richard M. Rios.

*Lucille Marino*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the briefs for appellant/cross-appellee William S. Johnson.

*Thomas J. Robinson*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Robert T. Stephan*, attorney general, were with him on the brief for appellee/cross-appellant.

The opinion of the court was delivered by

McFARLAND, J.: Richard M. Rios and William S. Johnson appeal their jury trial convictions of one count each of jointly making a false writing (K.S.A. 21-3711); one count each of individually making a false writing (K.S.A. 21-3711); and one count each of theft by deception (K.S.A. 21-3701[b]). The State has filed a cross-appeal challenging the jury instruction permitting the jury to merge multiple counts into single counts under the single larceny doctrine.

The relevant facts are quite complex.

William S. Johnson was the store manager of Dillard's Towne West Department Store (Towne West) in Wichita, Kansas, from March 1986 until his resignation on June 3, 1987. Richard Rios was the store manager of Dillard's Towne East Department Store (Towne East) in Wichita from sometime in 1984 until August 17, 1987. Johnson went to Towne East quite often between January and June of 1987. Johnson and Rios were business associates and friends.

On May 22, 1987, Kay Griffen, the Towne West Credit Manager and head of the cash room, saw Johnson enter the store's training room carrying a cash register ribbon. The training room is used solely for training store personnel to operate cash registers. He asked her if there were more ribbons in the stockroom. After fifteen or twenty minutes, Johnson emerged from the training room and told Ms. Griffen he would change the cash register ribbon, something Ms. Griffen knew the store manager would not do. Johnson thereafter moved the training cash register from the training room to a location behind his office.

When the Towne West's personnel director, Joyce Cooper, returned from vacation on May 27, 1987, Ms. Griffen told her about the incident concerning Johnson and the cash register ribbon and said she would look for the ribbon. The following day, May 28, 1987, Cooper and Griffen went into Johnson's office during his absence and searched for "what we thought we were looking for, the ribbon." In Johnson's briefcase they found a stack of thirty-six refund vouchers that had been rung up on a cash register but did not have the customer portion of the voucher filled out. The customer portion of the refund voucher contains the customer's name, address, store where the item was purchased, why it was returned, the salesperson who sold it, and the customer's signature. A "rung up" voucher contains the store department number, the salesperson's number, the amount of tax, and the total amount of money refunded. Ms. Cooper copied down the vouchers' serial numbers and the money amount which had been rung up on each voucher. The cash register ribbon was subsequently found by the investigating duo on top of the credenza in Johnson's office.

The next day, May 29, 1987, Cooper compared the refund vouchers from the cash room with the list of vouchers in Johnson's briefcase and discovered that one voucher for $147 had been cashed at 5:20 p.m. that day. The cash room is the location where all store cash, checks, and vouchers are processed. The cash room is always locked. All store money is kept inside the safe in the cash room. The lower part of the safe, containing a minimal amount of cash, is left open during the day. The store manager (Johnson), the operations manager (Griffen), and two area sales managers have free access to the cash room and safe.

Refund vouchers come to Towne West from Dillard's corporate headquarters in Little Rock, Arkansas, and are numbered sequentially. Refund vouchers are kept in the cash room and checked out in a series with a record made of who is checking them out. Dillard's uses refund vouchers to make a record of refunds that are given to customers who return merchandise.

On June 1, 1987, Cooper found that more of the refund vouchers found in Johnson's briefcase had been cashed on May 30, 1987. She notified Bob Appleby, a Dillard's official at the corporate headquarters, of the suspicious facts she had uncovered.

On June 3, 1987, Appleby, along with other Dillard's corporate officials, went to Wichita to investigate the list of refund vouchers provided by Cooper and Griffen. They met with Johnson, Cooper, and Griffen. Johnson confessed to cashing the refund vouchers. He stated he did it "for the obvious reason, I needed the money."

Richard Willey, one of the Dillard's corporate officials present, testified Johnson explained that he had taken customer names and addresses and had rung up fraudulent vouchers on the training register. Johnson stated that he would then place a voucher in the safe and remove money in the amount of the voucher. It was estimated about $3,000 had been taken on the prior weekend. Johnson admitted to the taking and he indicated he would repay that amount.

Johnson resigned that same day, June 3, 1987. Following his resignation, Griffen found packages of refund vouchers in Johnson's office file cabinet, and found a full box of refund vouchers in a storeroom adjacent to Johnson's office.

On June 4, 1987, Johnson spoke with Kevin Fisher, Dillard's corporate internal auditor. Fisher, who had come to Wichita from Little Rock to investigate the alleged misuse of refund vouchers at Towne West, was responsible for evaluating the company's accounting systems and controls for their adequacy in protecting the company's assets.

Johnson described to Fisher the procedures he used to ring up refund vouchers on the training register at Towne West. He used tape to prevent the register from printing numbers on the vouchers which would indicate what register had been used and what store had processed the refund.

After Fisher returned to Little Rock, he conducted a review of refund vouchers cashed at the two Wichita Dillard's stores between January 1, 1987, and June 4, 1987, seeking evidence of Johnson's procedures with the refund vouchers. He found that numerous refund vouchers without store identification data had been cashed at both Towne West and Towne East. Further corporate investigations revealed that the refund vouchers had come from Towne West, when Johnson was manager, and Towne East, when Richard M. Rios was manager. Fisher subsequently returned to Wichita and turned the refund vouchers over to the Wichita Police Department. Fisher also provided Detective Tom

Burnett with records containing handwriting of both Johnson and Rios.

Following a police investigation, Johnson and Rios were charged, on December 9, 1987, in a 111-count information. Johnson was charged with 59 counts of making a false writing (K.S.A. 21-3711) and four counts of theft by deception (K.S.A. 21-3701[b]). Rios was charged with 47 counts of making a false writing and 19 counts of theft by deception. The offenses were alleged to have been committed between January 17, 1987, and May 30, 1987.

The State had in its possession between six and seven hundred of these bogus refund vouchers. The State elected to proceed on only 88 of the vouchers on false writing charges. Both defendants were charged jointly on some vouchers, which accounts for the discrepancy between the number of vouchers and false writing counts. The State subsequently filed a motion to admit all the uncharged vouchers to show plan, intent, lack of mistake, etc. Also, said evidence would buttress its case as to the handwriting identification. The motion was denied. At the same hearing, the defendants' motions for severance of their trials was denied.

In addition to his testimony concerning Johnson's description of his methodology in ringing up refund vouchers, Kevin Fisher testified to the standard procedures for handling refund transactions. He testified that when a refund is rung up the register number, store number, transaction number, clerk number, dollar amount, and merchandise number are printed on a refund voucher and transferred to the Little Rock central processing area. If a customer wants a cash refund, he or she must take the refund voucher to the store credit office and get cash from a clerk. A refund slip is then placed in the register, and the register is still in balance for accounting purposes. Ringing up refunds on training registers did not have an impact on physical inventory or the financial reporting system of Dillard's. Fisher did not know whether the bogus refund vouchers were exchanged for cash or merchandise; however, he knew that either cash or merchandise had to have been exchanged for each refund voucher that was "cashed," as otherwise the cashier's report would not have been in balance for the days the refund vouchers were "cashed." Finally, Fisher testified that Towne East had a $257,000 overage

of inventory and that Towne West had a $184,422 overage. This overage could not be explained.

Expert evidence on handwriting was introduced to tie Johnson and/or Rios to particular vouchers. All refund vouchers were altered in precisely the same manner, which was consistent with Johnson's statements as to how he had proceeded. Evidence was introduced that each defendant had entered his store's cash room at unusual times.

Over the State's objection, the jury was given an instruction on the single larceny theory. The jury, under the instruction, merged the multiple counts into one conviction each of making a false writing (individually), making a false writing (jointly), and theft by deception.

In this consolidated appeal, the defendants appeal from their convictions and the State cross-appeals from the trial court's giving of the single larceny instruction.

Numerous claims of error are asserted by the defendants herein. Two fundamental questions immediately surface from the multiple issues. Does the conduct of the defendants, as established at trial, legally constitute either the crime of theft by deception or the making of a false writing?

## THEFT BY DECEPTION

K.S.A. 21-3701 provides, in pertinent part:

"Theft is any of the following acts done with intent to deprive the owner permanently of the possession, use or benefit of the owner's property:

(a) Obtaining or exerting unauthorized control over property; or

(b) Obtaining by deception control over property; or

(c) Obtaining by threat control over property; or

(d) Obtaining control over stolen property knowing the property to have been stolen by another."

In *State v. Finch*, 223 Kan. 398, 573 P.2d 1048 (1978), this court examined the historical background of our consolidated theft statute (K.S.A. 21-3701) and analyzed the elements of theft by deception. Finch had been observed by a security guard in a department store removing price tags from certain merchandise and placing them on similar, but higher priced merchandise. The cashier was warned to be on the lookout for Finch and to let her pass through the checkout stand unchallenged, paying only the lowered prices. As Finch was leaving the store, she was

stopped by the security guard and returned to the store for arrest. She was subsequently charged with and found guilty of theft by deception.

On appeal, Finch claimed her alleged acts were insufficient to constitute the crime of theft by deception. This court agreed, stating:

"At the outset we should examine the Kansas statutes which pertain to the crime of theft by deception to determine the elements of the crime. K.S.A. 21-3701 was enacted in 1969 (effective July 1, 1970) as a consolidated theft statute to combine the former crimes of larceny, embezzlement, false pretenses, extortion, receiving stolen property and the like into a single crime of theft. There is a comprehensive discussion of the historical background of the statute and the objective sought in the consolidation of the state's theft laws in an excellent article by Professor Paul E. Wilson. (*Thou Shalt Not Steal: Ruminations on the New Kansas Theft Law*, 20 Kan. L. Rev. 385 [1972].) The statute is also discussed in *State v. Bandt*, 219 Kan. 816, 549 P.2d 936. The crime of theft by deception is covered under K.S.A. 21-3701(b) which states in pertinent part as follows:

" '21-3701. **Theft.** Theft is any of the following acts done with intent to deprive the owner permanently of the possession, use or benefit of his property:

. . . .

(b) Obtaining by deception control over property; . . .'

K.S.A. 21-3110 defines several of the words used in the theft statute:

" '21-3110. **General definitions.** The following definitions shall apply when the words and phrases defined are used in this code, except when a particular context clearly requires a different meaning.

. . . .

" '(5) "Deception" means knowingly and willfully making a false statement or representation, express or implied, pertaining to a present or past existing fact.

. . . .

" '(11) "Obtain" means to bring about a transfer of interest in or possession of property, whether to the offender or to another.

" '(12) "Obtains or exerts control" over property includes but is not limited to, the taking, carrying away, or the sale, conveyance, or transfer of title to, interest in, or possession of property.'

"Because section (b) of 21-3701 is the only provision in the 1970 criminal code dealing with the crime of obtaining property by deception or fraud, it is clear that that subsection incorporates therein the former crime of obtaining property by false pretenses. That offense was previously defined and made a crime in K.S.A. 21-551 (Corrick 1964) which was repealed when the new criminal code became effective. In prosecutions under the former

statute the state was required to prove the following four elements to establish the crime of obtaining property by false pretenses:

(1) There must be an intent to defraud;

(2) there must be an actual fraud committed;

(3) false pretenses must have been used for the purpose of perpetrating the fraud; and

(4) the fraud must be accomplished by means of the false pretenses made use of for the purpose, that is, they must be the cause, in whole or in part, which induced the owner to part with his money or property. (*State v. Handke*, 185 Kan. 38, 340 P.2d 877; *State v. Matthews*, 44 Kan. 596, 25 Pac. 36; *State v. Metsch*, 37 Kan. 222, 15 Pac. 251.)

The requirement of a reliance upon the false pretenses which induced the owner to part with his property is generally considered to be an essential element of the crime of false pretenses throughout this country. In *State v. Handke*, supra, the court noted the following general rule as stated in 35 C.J.S. False Pretenses § 6, p. 811:

" 'Generally speaking, to constitute the crime of obtaining property by false pretenses there must be a false representation or statement of a past or existing fact, made by accused or someone instigated by him, with knowledge of its falsity and with intent to deceive and defraud, and adapted to deceive the person to whom it is made; and there must be, further, a reliance on such false representation or statement, an actual defrauding, and an obtaining of something of value by accused or someone in his behalf, without compensation to the person from whom it is obtained. . . .'

"It is clear that under the facts of this case, the defendant could not have been convicted of the crime of false pretenses under the former statute. The state's failure to show actual deception and reliance would sustain, at most, a conviction of an attempt to obtain property by false pretenses. (*State v. Visco*, 183 Kan. 562, 331 P.2d 318.)

"The first question which we must determine is whether the legislature, by incorporating the former crime of obtaining property by false pretenses within the crime of theft by deception in K.S.A. 21-3701(b), intended to require the state to prove as an element of the crime of theft by deception that the defendant's false representation was the instrumentality or means by which he received or obtained possession of the property, that is, that the owner was genuinely deceived by the defendant's representations, and relied thereon in surrendering control over his property to the defendant. An examination of the cases from other jurisdictions which have enacted consolidated theft acts leads to the conclusion that in every such jurisdiction the basic elements of the various theft crimes included within the particular consolidated theft statute have not been changed, absent a clear showing of a contrary legislative intent. (*People v. Ashley*, 42 Cal. 2d 246, 267 P.2d 271, 279 [1954], *cert. den.* 348 U.S. 900 [1954]; *State v. Gale*, 322 S.W.2d 852 [Mo. 1959]; *People v. Karp*, 298 N.Y. 213, 81 N.E.2d 817 [1948]; *State v. McCormick*, 7 Ariz. App. 576, 442 P.2d 134, 139, vacated on other grounds, 104 Ariz. 18, 448 P.2d 74 [1968].)

"Professor Paul E. Wilson, in his article on the consolidated theft act, makes the following observations:

" ' "Theft" is a term that was not employed by the common law of crimes; at least, the term was not used to identify a common law offense. By the definition of a statutory crime of theft, was it intended to broaden significantly the scope of the traditional crimes within its purview? Consolidation does not mean enlargement. There is authority that simplified stealing statutes neither broaden the crime of larceny nor proscribe conduct previously legal and that the fact of consolidation does not change the elements of the several offenses consolidated. The drafters of the Kansas statute did not generally intend to prohibit conduct that was not criminal prior to the enactment of the code. . . .

" '. . . [T]here was no intent, nor is there evidence of an intent, to change the basic natures of the crimes the new act comprehends. . . .

" '. . . At the same time, the elements of the several types of theft merged together have not been changed, and a judgment of conviction based on a general verdict of guilty can be sustained only if the evidence discloses elements of one of the consolidated offenses.' (20 Kan. L. Rev. 398-400.)

"Professor Wilson's conclusions in this regard are referred to in *State v. Bandt*, supra. The issue involved here was not before us in *State v. Adair*, 215 Kan. 54, 523 P.2d 360. We find no language in the statute which demonstrates a legislative intention to change the elements of the several offenses which were consolidated in the new theft statute.

"On the contrary, it is our judgment that the words contained in the statute, when construed in accordance with the statutory definitions or when given their natural and ordinary meanings, show clearly that the legislature intended to require the state to prove that the intended victim was *actually* deceived and *actually* relied upon the false representation in order for the defendant to be found guilty of theft by deception. K.S.A. 21-3701 requires that the defendant obtain *by* deception control over property with the intent to deprive the owner permanently of the possession, use, or ownership of his property. The state in the present case was required to show that the defendant obtained control over the property of Richman-Gordman *by* deception. The word 'by' has several natural and ordinary meanings which are universally accepted. (Webster's Third New International Dictionary, unabridged, pp. 306-307.) The word 'by' is sometimes used to express a relation of time and sometimes to signify place or position. (12 C.J.S. By, p. 865.) Here it is clear that the word 'by' is not used in the statute to express a relation of time or place. It is obviously used as indicating an agency or instrumentality as a causative factor. See for example Ballentine, Law Dictionary with Pronunciations, Second Edition, where the word 'by' is defined as follows:

" 'The word may mean "through the means, act, or instrumentality of." . . . Thus, "an injury by accident" is synonymous with "an injury

caused by accident." See Carroll v. Industrial Commission, 69 Colo. 473, 19 A.L.R. 107, 109, 195 Pac. Rep. 1097.' (p. 180.)

"The term 'by' has been judicially construed where it is used in statutes making it a crime to obtain property by false pretenses. In *Commonwealth v. Walker*, 108 Mass. 309 (1871), the Supreme Judicial Court of Massachusetts states that the words 'by a false pretense' as used in the criminal statute were substantially equivalent to the words 'by means of a false pretense.' A California statute was construed in a similar manner in *People v. Harrington*, 92 Cal. App. 245, 267 Pac. 942 (1928), and most recently in *People v. Lorenzo*, 64 Cal. App. 3d Supp. 43, 135 Cal. Rptr. 337 (1976).

"The factual circumstances in *Lorenzo* are quite similar to those in the present case. There the defendant was observed by the manager of a supermarket to switch price tags from one kind of glove to another kind of glove and also to switch price tags placed on chickens. He was arrested by the manager in the parking lot after having paid the amount indicated on the switched price tags. He was charged with the offense of theft by false pretenses. In setting aside a conviction of theft by false pretenses, the Court of Appeals held that the defendant could not have been convicted of theft by false pretenses since the manager of the supermarket at no time relied upon the defendant's conduct. Since the manager was the agent of the market owner, his knowledge was held to be that of the market owner. The California Court of Appeals determined, however, that the offense of attempted theft by false pretenses had been established.

"Another quite similar case is *State v. Hauck*, 190 Neb. 534, 209 N.W.2d 580, 60 A.L.R.3d 1286 (1973). In *Hauck* the defendant, with the knowledge of the owner, changed price tags between two cartons, placing the lower price tag on the carton which he took to the checkout counter and attempted to purchase at that price. He was immediately arrested. In the course of the opinion the Supreme Court of Nebraska observed that, if the defendant had been successful in carrying out and completing the transaction as intended, he would have been guilty of obtaining property by false pretenses in violation of the state statute. The court pointed out, however, that an essential element of obtaining property by false pretenses is that there is reliance upon the representations made and stated that 'the pretense must be an effective cause in inducing the owner to part with his property, and if the owner has knowledge of the truth, the offense has not been completed.' (*State v. Bohannon*, 187 Neb. 594, 598, 193 N.W.2d 153 [1971].)

"We have concluded that in order to convict a defendant of theft by deception under K.S.A. 21-3701(b) the state must prove that the defendant with the required intent obtained control over another's property *by means of* a false statement or representation. To do so the state must prove that the victim was actually deceived and relied in whole or in part upon the false representation." 223 Kan. at 399-404.

As stated in *State v. Finch*, theft by deception, as defined by K.S.A. 21-3701(b), incorporates the prior crime of obtaining

money by false pretenses (K.S.A. 21-551 [Corrick]). Accordingly, in order to prove theft by deception, the State would have to prove that the defendants obtained control over Dillard's money by means of a false statement or representation, that the false statement or representation deceived Dillard's, and that Dillard's relied in whole or in part upon the false statement in giving up control of the money to the defendants.

PIK Crim. 2d 59.01 states this element as follows:

"That the defendant obtained control over the property by means of a false statement or representation which deceived _____ who had relied in whole or in part upon the false representation or statement of the defendant . . . ."

That element is lacking herein. The owner (Dillard's) placed defendants in charge of the respective stores. There is no deception claimed to be involved in the obtaining of these positions. In such capacity, each defendant had access to the respective safes, cash room, and vouchers in his store. Each was the highest ranking Dillard's employee in his respective store. The bogus vouchers were used to cover up the thefts, not to cause the corporation to part with the monies represented by the vouchers.

The acts of the defendants herein, as claimed by the State, would have constituted embezzlement pursuant to K.S.A. 21-545 (Corrick), which provides in pertinent part:

"[A]ny officer, clerk, agent, employee or servant of any corporation . . . or any person employed in such capacity . . . who shall embezzle or convert to his own use, or shall take, make away with, or secrete, with intent to convert to his own use, without the assent of his employer, any money . . . shall upon conviction thereof be punished in the manner prescribed by law for stealing property . . . ."

This statute was repealed in 1969 when embezzlement became a part of the consolidated theft statute (K.S.A. 21-3701). The former crime of embezzlement is now included in section (a) of K.S.A. 21-3701 relating to obtaining or exerting unauthorized control over property.

An analogy would perhaps be illustrative. A farmer hires a fox to be in charge of his chicken house. There is no deception by the fox in obtaining his position. The fox has full access to all parts of the operation as a part of his job. Let us assume the fox starts stealing eggs from the egg storage area. To cover up the

thefts, he replaces each stolen egg with a plastic one, or, perhaps, falsifies the records as to how many eggs have been laid. In such case, no theft by deception has occurred. The farmer has not been induced to part with the control of property through deception. The crime of embezzlement, now included within K.S.A. 21-3701(a), has been committed.

By contrast, let us suppose a fox con artist approaches the farmer, stating he represents a wealthy eccentric who will pay twice the market price for eggs but who will only deal anonymously through the fox. The farmer turns his eggs over to the fox on the latter's promise that he will return the following morning with payment therefor in cash. The fox never returns. The farmer is a victim of theft by deception as he parted with his property as the result of the false statements.

In the case before us, defendants should have been charged under K.S.A. 21-3701(a) rather than K.S.A. 21-3701(b). The elements of the latter statute are not satisfied by the evidence herein and hence the evidence is insufficient to support the convictions of theft by deception. These convictions must be reversed.

## MAKING A FALSE WRITING

K.S.A. 21-3711 provides:

"Making a false writing is making or drawing or causing to be made or drawn any written instrument or entry in a book of account with knowledge that such writing falsely states or represents some material matter or is not what it purports to be, and with intent to defraud or induce official action."

The complaint/information and jury instructions do not contain the wording "or induce official action." The charges are thus limited to making the false writings "with intent to defraud."

There are two basic questions involved in determining whether the conduct involved herein legally constitutes the making of a false writing.

The first problem concerns the nature of the instruments themselves. The second concerns the intended and actual use of the instruments.

Previous cases of making a false writing coming before us involved: statements in an application for a bank loan, *State v. Roberts-Reid*, 238 Kan. 788, 714 P.2d 971 (1986); statements in a false bank loan extension intended by bank officials to deceive bank examiners, *State v. Kee*, 238 Kan. 342, 711 P.2d 746 (1985);

statements made on city license and sales tax registration applications, *State v. Cuezze, Houston & Faltico*, 225 Kan. 274, 589 P.2d 626 (1979); and statements in campaign finance reports, *State v. Doyen*, 224 Kan. 482, 580 P.2d 1351 (1978).

In each of these cases, the charged defendant was alleged to have written or caused to be written an instrument containing false statements. The false statements were related to the defendant's own business or affairs. In contrast, the instruments herein were on Dillard's forms, each of which was made to appear to have been filled out at the request of a named customer seeking a refund of monies paid for merchandise and each of which carried what appeared to be the signature of the customer. In short, the vouchers were forged instruments.

K.S.A. 21-3710 provides:

"(1) Forgery is knowingly and with intent to defraud:

(a) Making, altering or endorsing any written instrument in such manner that it purports to have been made, altered or endorsed by another person, either real or fictitious, and if a real person without the authority of such real person; or altering any written instrument in such manner that it purports to have been made at another time or with different provisions without the authority of the maker thereof; or making, altering or endorsing any written instrument in such manner that it purports to have been made, altered or endorsed with the authority of one who did not give such authority; or

(b) Issuing or delivering such written instrument knowing it to have been thus made, altered or endorsed; or

(c) Possessing, with intent to issue or deliver, any such written instrument knowing it to have been thus made, altered or endorsed."

Forgery is a class E felony. Making a false writing is a class D felony. Clearly, the legislature intended that the conduct proscribed by K.S,A. 21-3711 deserves a more severe penalty than does the conduct proscribed by K.S.A. 21-3710. The State herein apparently believes it is free to elevate any forgery to the making of a false writing at whim as the latter statute includes all forgeries. We do not agree. The forgery statute specifically proscribed the making of an instrument which appears to have been made by another without that person's consent. Such other person may be real or fictitious. This is precisely what defendants are alleged to have done herein, and, hence, the conduct cannot also constitute the making of a false writing contrary to K.S.A. 21-

3711. We conclude that the conduct proscribed by K.S.A. 21-3711 does include conduct defined as forgery under K.S.A. 21-3710.

The second problem inherent in the making of a false writing conviction lies in the element that the false writing be made with "intent to defraud."

K.S.A. 21-3110(9) contains the following definition:

" 'Intent to defraud' means an intention to deceive another person, and to induce such other person, in reliance upon such deception, to assume, create, transfer, alter or terminate a right, obligation or power with reference to property."

Defendants did not obtain the money represented on each voucher because of the voucher. Dillard's was not induced and was not intended to be induced to part with the money shown on the voucher by presentation of the voucher. Dillard's had been deprived of the money shown on the voucher before the voucher was processed by Dillard's. Each voucher was created for and used to cover up the theft of the money shown on its face. Intent to defraud requires that the maker of the instrument intended to deceive another person and to induce such person, in reliance upon the deception, to assume, create, transfer, alter, or terminate a right, obligation, or power with reference to property. The evidence herein does not satisfy this element.

It may be argued that the cover-up of each theft by means of a voucher allowed each such theft to remain undiscovered and, hence, permitted the defendants to remain in the employ of Dillard's with the opportunity to commit new thefts. However, the statutory definition of intent to defraud is not broad enough to include the facts herein. Whereas a tort statute may be construed liberally in order to give effect to its remedial purpose, a criminal statute, with its punitive effect, must be strictly construed against the State and in favor of the accused. *State v. Trudell*, 243 Kan. 29, Syl. ¶ 2, 755 P.2d 511 (1988). A penal statute subject to strict construction should not be read so as to add that which is not readily found therein, or to read out what, as a matter of ordinary language, is in it. *State v. Haug*, 237 Kan. 390, Syl. ¶ 1, 699 P.2d 535 (1985).

It should be noted that intent to defraud is also an element of forgery as defined by K.S.A. 21-3710.

On the grounds previously set forth, we must conclude that the evidence herein was insufficient to support the convictions of making a false writing and the same must be reversed.

The other issues raised in the appeal and cross-appeal need not be addressed by virtue of the reversal of all convictions herein.

The judgment of the district court in each of the consolidated cases is reversed and the cases are remanded for further proceedings.