2 P.3d 647

**The STATE of Arizona, Appellee,**

v.

**Ronald Wayne PROCTOR and Robert James Olson, Appellants.**

Nos. 2 CA–CR 96–0414, 2 CA–CR 96–0417.

Court of Appeals of Arizona,
Division 2, Department A.

Sept. 8, 1998.

Review Denied Feb. 8, 2000.

Reconsideration Denied
April 14, 2000.

Grant Woods, Attorney General by Paul J. McMurdie and Christopher E. Avery, Tucson, for Appellee.

Susan A. Kettlewell, Pima County Public Defender by Creighton Cornell, Tucson, for Appellant Proctor.

Isabel G. Garcia, Pima County Legal Defender by Lois Yankowski, Tucson, for Appellant Olson.

*OPINION*

BRAMMER, Judge.

¶1 Appellants Ronald Proctor and Robert Olson were convicted following a jury trial of one count of conspiracy and four counts of fraudulent scheme and artifice. The state alleged that eight real estate transactions constituted acts in furtherance of the conspiracy, four of which were the bases of the fraudulent scheme and artifice counts. In their consolidated appeals, both appellants contend that the fraudulent scheme and artifice statute is unconstitutional and that the trial court erred in ordering them to pay restitution. We affirm the convictions and the sentences imposed, but vacate the restitution order, remanding for a redetermination of the amount to be paid the victims.

¶2 Although there is no equivalent to Rule 28(g), Ariz.R.Civ.App. P., 17 B A.R.S., in the Arizona Rules of Criminal Procedure, because we find that only our resolution of appellants' challenges to the statute and the order of restitution meets the standards for publication in Rule 28(b), we publish that portion of our decision and address appellants' remaining issues in a simultaneously filed memorandum decision.

**Facts and Procedural History**

¶3 We view the evidence in the light most favorable to sustaining the verdicts and resolve all inferences against appellants. *State v. Atwood*, 171 Ariz. 576, 832 P.2d 593 (1992). So viewed, the evidence showed that, beginning in the early 1980s, Proctor and Olson engaged in numerous real estate transactions designed to defraud home sellers. With some variations, the general scheme was as follows. Either Proctor, who was a real estate broker, his housemate, or one of his employees would purchase vacant rural land near highway interchanges and subsequently convey the property to Olson, or Olson would purchase the property after Proctor had negotiated a purchase on Olson's behalf. Proctor would search the real estate listings to find homes for sale that the owners wanted to sell quickly or that had been

on the market for some time, and in which the owners had substantial equity. Olson would offer to buy the home at or near the asking price, stating that he or one of his family members intended to live in the home. The offer would provide that the purchase price would be paid in part with cash with the balance to be paid by a trade of the vacant land, which Olson would claim was worth approximately one half to almost the entire asking price of the seller's home. Appellants used different methods of inflating the value of the vacant land, such as presenting an appraisal that relied on sales of or offers to purchase comparable properties either owned by Proctor or otherwise related to Proctor–Olson transactions.

¶4 In an apparent reference to a section of the Internal Revenue Code that permits the deferral of tax liability for gain realized on certain real estate transactions, Olson would often present an offer as a "1031" tax-deferred land exchange, stating he wanted to trade land rather than pay cash to avoid paying capital gains tax. The evidence revealed that neither appellants nor any of the sellers involved in the transactions were eligible to participate in such an exchange.

¶5 Uniformly, none of the homeowners initially wanted to trade his or her home for the vacant property. Olson would then try to make the offer more attractive either by suggesting he find a buyer for the land he was offering to trade, the buyer being Proctor, or by presenting Proctor as a buyer of the land in the initial offer.[1] Appellants would present Proctor as an expert in truck stop development who intended to develop a truck stop on the property offered in trade or to resell it to other developers for this purpose. Many of the sellers testified they were impressed by Proctor's status as a "real estate professional." One seller believed Proctor was "[a] millionaire that knew everything about the land." In a letter to another seller's attorney, Proctor claimed his assets totaled nearly $1,500,000, although evidence was presented that he had virtually no assets and debts totaling $11,300, $4,500 of which he owed to Olson.

---

1. Alternatively, in some of the uncharged transactions admitted as other act evidence, Olson

would guarantee that he would find a buyer within three years after the transaction closed.

¶ 6 Proctor structured his offers to purchase the traded land so as to require only a small down payment with the balance of the purchase price to be paid by execution of a promissory note secured by a deed of trust on the land. The promissory note provided for interest-only payments at infrequent intervals, with the principal balance to be paid in a one-time "balloon" payment 18 to 36 months after the sale closed. The promissory notes Proctor gave were without recourse to him, i.e., he assumed no personal obligation to pay the debt, a detail most of the sellers and their real estate agents testified they did not know.

¶ 7 Proctor's offers were submitted to the sellers on standardized commercial real estate purchase contracts, which denoted their approval by the Arizona Association of Realtors and which Proctor had altered by adding in a short blank space at the end of a line in a section entitled, "Encumbrances and Impounds," the phrase: "Buyer's liability is limited to securing property." Neither Proctor nor Olson told any of the sellers or agents that Proctor's liability was limited to the vacant land. Most of the sellers and real estate agents testified they either were not aware that the purchase contracts, promissory notes, and related documents contained nonrecourse language or, if they were aware of the language, did not understand its significance. Also, unbeknownst to the sellers and their agents, Olson supplied Proctor with the cash used to purchase and market the vacant land they received in trade and helped finance Proctor's search for other properties and the operation of Proctor's business.

¶ 8 Shortly after Olson acquired the homes, usually within a few weeks after the close of escrow, he would resell them for cash at prices considerably less than he had paid to purchase them. Proctor never developed or sold any of the vacant parcels of land he bought from the sellers. Rather, he defaulted on the notes he had given in the transactions that were the subject of the criminal charges. Indeed, while Proctor was negotiating to purchase some of the vacant land parcels that later sellers had taken in trade, he was already in default on some of the notes he had given earlier. Many of the

sellers foreclosed on the deeds of trust, regaining ownership of vacant land worth substantially less than they had been led to believe it was worth.

¶ 9 In 1990, the Cochise County Assessor contacted the Arizona Department of Real Estate after noticing out-of-the-ordinary real estate purchase and sales activity involving appellants. The assessor testified that Olson had provided some of the sellers with affidavits that valued the vacant land "unrealistically high."

¶ 10 Appellants were subsequently indicted on four counts of fraudulent scheme and artifice in connection with four transactions between 1985 and 1989 and one count of conspiracy to commit fraudulent scheme and artifice based on these four transactions and on four others that took place between 1987 and 1991. Following a 21-day jury trial, appellants were convicted on all counts and were sentenced to concurrent prison terms, the longest of which was 15.75 years, to be followed by seven years of probation. The court also ordered appellants to pay over $3,000,000 in restitution to the victims. This appeal followed.

### Constitutionality of Fraudulent Scheme and Artifice Statute

¶ 11 Appellants contend that the fraudulent scheme and artifice statute, A.R.S. § 13–2310, is unconstitutionally vague, overbroad, and internally inconsistent and that the trial court erred in denying their motions for judgment of acquittal made on that basis. Section 13–2310 provides in relevant part:

A. Any person who, pursuant to a scheme or artifice to defraud, knowingly obtains any benefit by means of false or fraudulent pretenses, representations, promises or material omissions is guilty of a class 2 felony.

B. Reliance on the part of any person shall not be a necessary element of the offense described in subsection A.

Appellants argue that the language in subsection A requiring the state to show that the defendant received a benefit "by means of" fraudulent conduct is inconsistent with that of subsection B, which provides that the state

is not required to show the victim relied on the fraudulent representations, promises, or material omissions. As a result, they contend, the statute is unconstitutionally vague and ambiguous. We disagree.

¶ 12 The primary rule of statutory construction is to determine and give effect to legislative intent. *Mail Boxes v. Indus. Comm'n,* 181 Ariz. 119, 888 P.2d 777 (1995). We determine legislative intent by reading the statute as a whole, giving meaningful operation to all its provisions, and by considering factors such as the statute's context, language, history, subject matter, effects and consequences, spirit and purpose. *Wyatt v. Wehmueller,* 167 Ariz. 281, 806 P.2d 870 (1991).

¶ 13 A brief review of the statute's history is helpful in addressing appellants' arguments. In *State v. Haas,* 138 Ariz. 413, 675 P.2d 673 (1983), the supreme court interpreted an earlier version of the statute, A.R.S. § 13–320.01.[2] The court noted that § 13–320.01 was patterned after the federal mail fraud statute, 18 U.S.C. § 1341, stating that an Arizona statute adopted from a federal statute is presumed to have been adopted with the construction the federal courts previously placed upon it.

¶ 14 The former version of the statute the court addressed in Haas did not state whether actual, or subjective, reliance on the part of the victim was a required element of the crime. Because the federal courts had held that actual reliance was not required for convictions under the mail fraud statute, *United States v. Halbert,* 712 F.2d 388 (9th Cir.1983); *United States v. Netterville,* 553 F.2d 903 (5th Cir.1977), the court in Haas stated that an objective standard applied to § 13–320.01, stating that a defendant's behavior "is fraudulent when it is 'reasonably calculated to *deceive* persons of ordinary prudence and comprehension.'" 138 Ariz. at 423, 675 P.2d at 683, *quoting Netterville,* 553 F.2d at 909 (emphasis in *Netterville*); *see also State v. Weiner,* 126 Ariz. 454, 616 P.2d

914 (App.1980) (although conviction for grand theft by false pretenses, former A.R.S. § 13–661, requires that the victim rely on false representation, there is no requirement of reliance in § 13–320.01).

¶ 15 The legislature renumbered the statute in 1978 and amended it in 1980,[3] adding subsection B, which codified the previously expressed case law that reliance is not a required element of the crime. That codification was acknowledged in cases decided subsequent to the addition of subsection B. *See State v. Bridgeforth,* 156 Ariz. 60, 750 P.2d 3 (1988) (approving jury instruction that state need not prove any person relied on defendant's representations for fraudulent scheme and artifice conviction); *see also State v. Fierson,* 146 Ariz. 287, 705 P.2d 1338 (App.1985) (although conviction for grand theft by false pretenses under A.R.S. § 13–1802(A)(3) requires that victim rely on false representations, fraudulent scheme and artifice statute explicitly excludes that requirement).

¶ 16 Appellants argue that the language in § 13–2310(A) retained from the former statute—that the defendant receive a benefit "by means of" fraudulent conduct—is inconsistent with subsection B's provision that reliance by the victim is not required, rendering the statute "inherently inconsistent." Although the two provisions could arguably have been better harmonized, we do not find them so inconsistent as to render the statute unconstitutionally vague and ambiguous. *See State v. Tocco,* 156 Ariz. 116, 120, 750 P.2d 874, 878 (1988) (court will not declare void for vagueness every statute it believes "could have been drafted with greater precision"); *Fuenning v. Superior Court,* 139 Ariz. 590, 598, 680 P.2d 121, 129 (1983) ("Due process requires neither perfect notice, absolute precision nor impossible standards."). When read together, *see Wyatt,* the two provisions clearly evince the legislature's intent that a defendant must engage in fraudulent behavior to be convicted of violating the stat-

---

2. Former A.R.S. § 13–320.01 provided in relevant part:
   Any person who, pursuant to a scheme or artifice to defraud, knowingly and intentionally obtains or attempts to obtain money, property

or any other thing of value by means of false or fraudulent pretenses, representations or promises is guilty of a felony....

3. 1980 Ariz. Sess. Laws, ch. 229, § 25.

ute, § 13–2310(A); *State v. Johnson,* 179 Ariz. 375, 880 P.2d 132 (1994) (false pretense created through words or omissions is key element of fraud and is act that separates fraud from routine theft), but the state need not show the victim actually relied upon the behavior. § 13–2310(B); *Bridgeforth; Fierson.* Pursuant to the construction *Haas* placed on the statute, the state need only show that a defendant's conduct was reasonably calculated to deceive persons of ordinary prudence and comprehension.[4]

¶ 17 Notwithstanding the plain language of subsection B and the statute's history, which has never required a showing of reliance to prove a violation, appellants nevertheless contend that the statute is irreconcilably inconsistent with dictum in *Johnson,* suggesting that reliance by the victim is a necessary element in proving a false pretense. We disagree that the language in *Johnson* shows that the two provisions of § 13–2310 are unconstitutionally inconsistent. The issue in *Johnson* was not whether actual reliance was required to prove a violation of the fraudulent scheme and artifice statute but, rather, whether the statute required that the defendant receive a benefit as a result of his or her fraudulent conduct. There, the defendant had been given a fuel credit card when he was hired by a trucking company. He subsequently used the card to buy gasoline for noncompany vehicles. Because the defendant had not obtained the card by a false or fraudulent pretense, representation, promise, or material omission, the court reduced his conviction for fraudulent scheme and artifice to theft. In dicta,[5] the

court quoted favorably from a Kansas case, *State v. Rios,* 246 Kan. 517, 792 P.2d 1065, 1070 (Kan.1990), in which the Kansas court had stated, " 'reliance upon the false pretenses which induced the owner to part with his property is generally considered to be an essential element of the crime … throughout this country.' " *Johnson,* 179 Ariz. at 378, 880 P.2d at 132. Again citing *Rios,* the court then said: "The statute's language means that the false pretense must actually cause the victim to rely and, as a result, give property or money to the defendant." *Id.* Whether the court was referring to a Kansas statute or the Arizona statute is unclear, although the statement is dicta in all events.

¶ 18 The court in *Johnson* did not directly construe § 13–2310, nor did it mention subsection B. We agree with the state that, had it intended to hold, in direct contravention of the language of subsection B and the basic rules of statutory construction, *see Mail Boxes,* that reliance is required to prove a fraudulent scheme and artifice, the court would certainly have done so explicitly and would not have simply abrogated the statute by inference. In the absence of such clear direction, we decline to find it did so. More importantly, because nothing suggests that the *Johnson* court's discussion of this issue was based upon an erroneous interpretation of § 13–2310, as appellants claim, we do not find the statutory language unconstitutionally vague or ambiguous.

¶ 19 In a separate argument, appellants contend that, because real estate professionals may violate § 13–2310 if they fail to disclose information not otherwise re-

---

4. In a related claim, Olson argues that, because the statute does not define the term "material omission," principles of statutory construction require that the words be given their ordinary and plain meaning and that the terms "are plainly understood to require reliance." Thus, he argues, subsection B is inconsistent with subsection A, rendering the statute unconstitutionally vague and ambiguous. We disagree. First, subsection B does not require a showing of actual reliance. *State v. Fierson,* 146 Ariz. 287, 705 P.2d 1338 (1985). Second, Olson is confusing the requirement that the omission be material with the concept of reliance. The trial court instructed the jury that "a matter is material if it is one to which a reasonable person would attach importance in determining his choice of action in the transaction in question." On appeal, Olson

relies on the following definition: "A misrepresentation is 'material' if it relates to a matter upon which plaintiff could be expected to rely in determining to engage in the conduct in question." *Black's Law Dictionary* 977 (6th ed.1990). That an omission must be one upon which a reasonable person under similar circumstances would rely does not mean actual reliance by the victim in a given case must be shown.

5. *See Town of Chino Valley v. City of Prescott,* 131 Ariz. 78, 81, 638 P.2d 1324, 1327 (1981) (citation omitted) (dictum is "a court's statement on a question not necessarily involved in the case[,] … is without force of adjudication … [and] is not controlling as precedent").

quired by civil law, e.g., by failing to inform purchasers of the value of land, the source of funds to pay for a purchase, and the nonrecourse nature of a purchase-money note, the statute is both vague and overbroad. Appellants argue that, because they had no fiduciary relationship with any of the sellers, they also had no civil duty to disclose anything to them, citing numerous civil cases to that effect. They assert that, even when there is no civil duty to disclose information, participants in real estate transactions could nevertheless be exposed to criminal liability under the statute "for omissions that no reasonable person could foresee would be actionable." Thus, appellants conclude, the statute is overbroad because it imposes a duty to disclose not found in civil law and is vague and overbroad because, in the absence of direction otherwise provided in the civil context, it provides insufficient direction for disclosure requirements to a participant in a real estate transaction.

¶ 20 Our supreme court's decision in *Haas* disposes of appellants' first claim.[6] There, the defendant, a real estate broker, was convicted of five counts of fraudulent scheme and artifice for buying property without disclosing to the sellers the inclusion of misleading security devices in their contracts. On appeal, the defendant claimed the trial court had erred in refusing to instruct the jury that, as a "cooperating" broker, he was not an agent of the sellers and thus had no duty to inform the sellers that they had not retained security interests in their properties. 138 Ariz. at 424, 675 P.2d at 684. The court of appeals had previously reversed the conviction, finding that this civil principle applied in the criminal context. The supreme court disagreed, concluding that the trial court had correctly refused to give a civil law "agency" instruction. It found that, because criminal liability under the fraud statute was not premised on the existence of an agency relationship, "[t]he state's proof of the requisite elements under th[e] statute would permit a conviction regardless of whether defendant was subject to civil liability for the same acts under an

agency theory." 138 Ariz. at 424, 675 P.2d at 684. Notwithstanding its earlier ruling that the defendant was not civilly liable for the sellers' losses because the defendant had no duty to inform them of the misleading language in the contracts absent an agency relationship with the sellers, *Buffington v. Haas*, 124 Ariz. 36, 601 P.2d 1320 (1979), the court upheld defendant's criminal convictions.

¶ 21 Appellants acknowledge the ruling in *Haas*, but ask us to reject it, citing *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), and *United States v. Dowling*, 739 F.2d 1445 (9th Cir. 1984), *vacated in part on other grounds*, 473 U.S. 207, 105 S.Ct. 3127, 87 L.Ed.2d 152 (1985). However, because the resolution of the present issue was necessary to the court's decision in *Haas*, *see Chino Valley*, and was not dictum as appellants contend, we are without authority to overturn it. *State v. Anderson*, 185 Ariz. 454, 916 P.2d 1170 (App. 1996).

¶ 22 We also find no merit to appellants' next claim that the statute is unconstitutionally vague and overbroad without the structure and direction provided by civil law principles. In *State v. Stewart*, 118 Ariz. 281, 283, 576 P.2d 140, 142 (App.1978), the court rejected the defendant's claim that the former fraudulent scheme and artifice statute was unconstitutionally vague and overbroad, noting that, to withstand a constitutional challenge, "[a]n offense must be defined in terms that [people] of average intelligence understand and the due process clause requires only that the law give sufficient warning that [they] may conform their conduct to its dictates." It then found:

> [persons] of average intelligence would understand that a "scheme to defraud" is a plan or decision to defraud and that an "artifice to defraud" is an "evil or artful strategy to defraud." Hence, a "[s]cheme" or "artifice" to defraud is to form some plan, device or trick to perpetrate the fraud upon another.

---

**6.** Although A.R.S. § 13–320.01, unlike A.R.S. § 13–2301, did not expressly include "material omissions," the court in *State v. Haas*, 138 Ariz.

413, 675 P.2d 673 (1983), construed the statute as proscribing this conduct as well.

*Id., quoting United States v. Dexter,* 154 F. 890, 893, 896 (N.D.Iowa 1907).

¶ 23  In considering a similar challenge to the mail fraud statute, the court in *United States v. Coyle,* 943 F.2d 424, 427 (4th Cir. 1991), *quoting Hammerschmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968, 970 (1924), stated that, "[e]ven though the concept of fraud within the meaning of [the] statute is broader than common law fraud, it is not limitless. It is characterized by 'trick, deceit, chicane, or overreaching ... [and] dishonest methods or schemes.' " In *Haas,* the supreme court noted the fraudulent scheme and artifice statute must be broad enough to "cover all of the varieties made possible by boundless human ingenuity," 138 Ariz. at 424, 675 P.2d at 684, including the use of "deceitful statements or half-truths or even the concealment of material facts." *Id.* at 418, 675 P.2d at 678. Thus, it concluded, "[t]here is a misrepresentation whenever the combination of what is said, what is half-said and what is not said results in misrepresenting the nature of the transaction." *Id.* at 424, 675 P.2d at 684. This was the scenario presented here; through a careful strategy of representations, promises, and omissions, appellants misled the sellers as to the nature of the related property transactions.

■ ¶ 24  It is not difficult to conclude that if a person of average intelligence can understand that a scheme or artifice to defraud is actionable conduct under the statute, *Stewart,* he or she can foresee that misrepresenting facts and concealing information in order to effectuate the scheme to defraud is also actionable. The more difficult task, of course, is reserved for the trier of fact, who must determine whether a defendant's material omissions are evidence of fraudulent intent, i.e., whether the defendant's omissions should be viewed as merely innocent nondisclosures or as actionable concealments. Although we acknowledge that, without the direction provided by civil law principles, this determination is circumstantial, we do not find that this phenomenon alone renders the statute unconstitutionally vague and overbroad.

¶ 25  We agree with appellants that whether a defendant had a civil duty to disclose material information may be relevant circumstantial evidence as to his or her state of mind in failing to do so. The trial court agreed as well, allowing appellants to argue this issue at trial. Conversely, that a defendant may have no civil duty to disclose information does not preclude the possibility that his or her decision not to reveal certain facts was motivated by, and was an integral part of, a plan to deceive others. *Haas.* This is especially true when, as here, evidence is presented that the defendants' material omissions were part of a larger scheme involving misrepresentations and false promises.

■ ¶ 26  Whether one can be prosecuted under the statute solely for failing to disclose material information not required to be divulged in a civil context, whether the intent to defraud element can be proved under such a scenario, and whether the statute would be vague and overbroad as a result are not before us. Because appellants made false representations and promises, in addition to material omissions, their conduct was clearly proscribed by the statute. Therefore, they have no standing to challenge the statute on any other ground. *Tocco; State v. Baldenegro,* 188 Ariz. 10, 932 P.2d 275 (App.1996).

¶ 27  We reject appellants' claim that § 13–2310 is unconstitutional. Its complementary provisions are not inconsistent and one may be convicted of violating it despite not having breached duties imposed by principles of civil law upon a participant in a real estate transaction. Conviction may also be had in the absence of proof that the victim actually relied on the fraudulent pretense, representation, promise or omission.

**Restitution**

¶ 28  Appellants contend the trial court erred in ordering them to pay, jointly and severally, nearly $3,150,000 in restitution, arguing that the court improperly ordered them to pay nearly $2,000,000 to the sellers in the uncharged transactions. Proctor also argues that the court improperly included prejudgment interest on all the transactions in calculating restitution, that it did not credit him for the value of the land the sellers

retained or for any partial payments appellants made, and that it improperly based its restitution award on a negotiated promissory note upon which one of the fraud counts was based.[7] We find that two of appellants' claims have merit.

### a. Restitution for sellers in uncharged transactions

¶ 29 The trial court ordered appellants to pay restitution for the losses the sellers incurred in the eight charged transactions as well as those the 16 sellers incurred in the uncharged transactions admitted as other act evidence. The statutes pertaining to the payment of restitution upon a criminal conviction provide in relevant part:

If a person is convicted of an offense, the court shall require the convicted person to make restitution to the person who is the victim of the crime ... in the full amount of the economic loss as determined by the court and in the manner as determined by the court ... pursuant to chapter 8 of this title.

A.R.S. § 13–603(C).

A. Upon a defendant's conviction for an offense causing economic loss to any person, the court, in its sole discretion, may order that all or any portion of the fine imposed be allocated as restitution to be paid by the defendant to any person who suffered an economic loss caused by the defendant's conduct.

B. In ordering restitution for economic loss pursuant to § 13–603, subsection C or subsection A of this section, the court shall consider all losses caused by the criminal offense or offenses for which the defendant has been convicted.

A.R.S. § 13–804. It is well settled that a defendant may be ordered to pay restitution to victims under § 13–603(C) only for charges that he or she has admitted, of which he or she has been found guilty, or for which he or she has agreed to pay restitution. *State v. French,* 166 Ariz. 247, 801 P.2d 482

(App.1990); *State v. Pleasant,* 145 Ariz. 307, 701 P.2d 15 (App.1985); *State v. Monick,* 125 Ariz. 593, 611 P.2d 946 (App.1980); *State v. Reese,* 124 Ariz. 212, 603 P.2d 104 (App.1979).

¶ 30 The state argues that restitution may be ordered to compensate victims not named in an indictment, noting that the court can order restitution for victims of crime pursuant to § 13–603(C) or to any person suffering an economic loss as part of a fine imposed pursuant to § 13–804(A). As support for this argument, it cites, inter alia, *State v. Steffy,* 173 Ariz. 90, 839 P.2d 1135 (App.1992) (defendant liable for all losses resulting from criminal offense even if victim does not request restitution). Although *Steffy* holds that a defendant is liable for the total losses caused by the offense of which he or she has been convicted, comporting with the language of § 13–804(B), it does not address whether a defendant may be ordered to pay restitution to individuals who might have suffered an economic loss as a result of the defendant's arguably criminal conduct but for which the defendant has neither been charged nor convicted and who are not named as victims in the indictment.

¶ 31 In *French,* the court vacated the restitution ordered for losses incurred by the owner of a motel where the crimes of which the defendant was convicted took place, finding that the motel owner was not a victim of the crime entitled to restitution under § 13–603(C). Noting that the subsection limits restitution "to the person who is the victim of the crime" of which the defendant has been convicted, the court posited that if "the legislature had intended to require a defendant to pay restitution to any person incurring loss as the result, direct or indirect, of defendant's behavior, rather than to 'victims of *the* crime,' the legislature would have so stated." 166 Ariz. at 249, 801 P.2d at 484.

¶ 32 We agree with the state that § 13–804(A) appears to contemplate a wider group of persons to whom a defendant may be ordered to pay restitution than § 13–603(C).

7. The state asserts that appellants failed timely to file their objections to the restitution order as directed by the trial court. The record reveals that the trial court stated only that appellants' objections to the restitution order were "due by

July 5, 1996." Appellants filed their supplemental objections on July 5. Because July 4 was a national holiday, we find appellants met the court's deadline, notwithstanding any ambiguity in the order.

It authorizes the court to order restitution to "any person" suffering an economic loss stemming from an offense of which the defendant is convicted.[8] Conversely, we find the sellers in the uncharged transactions were not victims pursuant to § 13–603(C), nor did their economic loss stem from the criminal offenses of which appellants were convicted. Indeed, the only connection between the sellers in the charged and uncharged transactions was that they were arguably all part of appellants' larger scheme to defraud homesellers. Consequently, we find that the trial court could not properly order appellants to pay restitution to the sellers in the uncharged transactions. We therefore vacate that part of the restitution order pertaining to the victims of the uncharged transactions.

### b. Interest

■ ¶ 33 The state's restitution calculations were submitted to the court before sentencing, and the court apparently relied on them in ordering restitution. In calculating restitution for each seller, the state added to the original principal amount of each of Proctor's promissory notes, upon each of which he had defaulted, the amount of interest that had accrued on each, based upon its stated interest rate, from the time of the close of escrow to the date of the originally scheduled sentencing, May 20, 1996.[9] Citing *State v. Foy*, 176 Ariz. 166, 859 P.2d 789 (App.1993), Proctor argues the court erred in including that interest in the restitution awards.

¶ 34 The court in *Foy* reviewed the statutory scheme pertaining to restitution, including the definition of "economic loss," as used in § 13–804(B), which provides in relevant part:

"Economic loss" means any loss incurred by a person as a result of the commission of an offense. Economic loss includes lost interest, lost earnings and other losses which would not have been incurred but for the offense. Economic loss does not include losses incurred by the convicted person, damages for pain and suffering, punitive damages or consequential damages.

A.R.S. § 13–105(14). The court concluded that, "although the legislature intended to compensate victims of crime, it intended to do so for those economic losses incurred as a direct result of the commission of the offense and that would not have been incurred '*but for the offense*.'" 176 Ariz. at 170, 859 P.2d at 793, *quoting* § 13–105(14) (emphasis added in *Foy*). It found that only interest losses directly attributable to the defendant's conduct were reimbursable. Consequently, the court vacated that part of the trial court's restitution order requiring the defendant to pay 10 percent interest per annum on the original restitution award. Conversely, the court held that lost interest for restitution purposes includes "interest amounts previously agreed upon between the victim(s) and defendants(s) or a third party to which the victim would have been entitled and would have received but for the defendant's criminal conduct," 176 Ariz. at 171, 859 P.2d at 794, giving · as an example of such losses "notes accruing interest at a specific rate for a pre-determined period of time." *Id.* at 171 n.2, 859 P.2d at 794 n. 2.

¶ 35 Proctor does not argue that the court erred in including in the restitution award the interest that had accrued on the notes from the close of escrow to his default on the notes, which, in each instance, occurred when the payments on the notes were due, apparently agreeing that he was obligated to pay interest on the notes through that time. He asserts, however, that "[p]rejudgment interest from the date of default to the date of conviction is precluded as a matter of

---

8. For example, although the issue was apparently not before the court in *French*, it is possible the motel owner there, who could not be awarded restitution under § 13–603(c) because he was not a victim of the crime, could have been awarded restitution under § 804(A).

9. For example, in one of the transactions, the promissory note was in the amount of $66,000, with an interest rate of nine percent. The interest that had accrued on the note from the date of the close of escrow, June 12, 1986, to the date originally scheduled for sentencing, May 20, 1996, approximately ten years, was calculated at $50,116. Thus, the restitution the state calculated for this count, and which the court subsequently ordered, was $116,116.

law," citing the language in *Foy* that interest cannot be part of a restitution award unless the parties have previously agreed upon it. He refers us to nothing in the notes, however, indicating that the parties had agreed that Proctor would be relieved from paying interest if he failed to pay the principal when due. Nor do we find such an indication in the record. Although the terms of the notes at issue are not identical and although none of the notes contains an explicit provision requiring Proctor to pay postdefault interest, we find that a fair reading of each is that Proctor was obliged to pay interest on the notes until he had repaid the principal.[10] By ordering the restitution it did, the trial court must have concluded that none of the notes has been repaid. It also apparently found that the interest continued to accrue after Proctor defaulted on the loans. Because we find nothing in the notes clearly commanding a contrary result, we cannot say the trial court erred in so finding. Accordingly, we affirm the award of restitution for interest owed from the close of escrow until the date of sentencing.

### c. Credit for benefits received

¶ 36  Proctor next argues the trial court erred in ordering restitution based upon the "face value" of each promissory note with no credit for the value of the vacant land the sellers received or for any partial payments he made to them. An order of restitution must reflect the loss the victims actually suffered. § 13–804(B). *See also State v. Scroggins*, 168 Ariz. 8, 810 P.2d 631 (App.1991). The record shows that the state's calculations on restitution, upon which the court apparently relied, did not take into account the value of the land some of the sellers had obtained after foreclosing on the notes nor the amount of any principal or interest payments Proctor had made on the notes. Accordingly, we direct the trial court to reduce the restitution award, as to Proctor, to reflect the benefits the sellers received from the transactions.

---

10.  For example, one of the notes provided simply: "interest to be first deducted from said semi annual installments and the balance applied on

### d. Restitution on count two

¶ 37  Lastly, Proctor argues that, because he and the seller had renegotiated the terms of the promissory note in count two, the court erred in basing its restitution award upon the first note, claiming "it no longer existed." We disagree. Proctor completed the crime of fraudulent scheme and artifice when he induced the seller in count two to sell him the vacant property. Thus, at that point, the seller was entitled to restitution for the losses he had incurred as a result of Proctor's failure to repay the note. Whether the seller and Proctor entered into a later transaction with different terms is irrelevant, with the exception that, if the parties agreed to new terms that were more beneficial to the seller, the seller should be awarded restitution based upon the later agreement. Accordingly, although the trial court could have awarded the seller restitution based on the terms of the second note, we find it was not required to do so.

¶ 38  Appellants' convictions and sentences are affirmed. The restitution orders as to both appellants are vacated in part and remanded to the trial court for redetermination consistent with this opinion.

CONCURRING: WILLIAM E. DRUKE, Chief Judge, and M. JAN FLÓREZ, Presiding Judge.

---

the principal sum until said principal sum is paid."