No. 111,640

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CHRISTOPHER R. WARD,
*Appellant*.


SYLLABUS BY THE COURT


1.

The crime of theft by deception is obtaining control over property or services, by deception, with intent to permanently deprive the owner of the possession, use, or benefit of the owner's property or services. K.S.A. 2015 Supp. 21-5801(a)(2).


2.

Theft by deception requires the State to prove (1) that the defendant obtained control over property by means of a false statement or misrepresentation, (2) that the false statement or misrepresentation deceived the victim, and (3) that the victim in whole or in part relied upon the false statement in relinquishing control of the property.


3.

Making false information is making, generating, distributing, drawing, or causing to be made, generated, distributed, or drawn any written instrument, electronic data, or entry in a book of account with knowledge that such information falsely states or represents some material matter or is not what it purports to be with intent to defraud, obstruct the detection of a theft or felony offense, or induce official action. K.S.A. 2015 Supp. 21-5824(a).

1

**4.**

Forgery is, with intent to defraud, making, altering, or endorsing any written instrument in such manner that it purports to have been made, altered, or endorsed by another person, either real or fictitious, and if a real person without the authority of such person; or altering any written instrument in such manner that it purports to have been made at another time or with different provisions without the authority of the maker thereof; or making, altering, or endorsing any written instrument in such manner that it purports to have been made, altered, or endorsed with the authority of one who did not give such authority. K.S.A. 2015 Supp. 21-5823(a)(1).

**5.**

Although the definitions of making false information and forgery are similar, the two crimes are distinct; the principal factor distinguishing the two is that forgery involves the making, altering, or endorsing a written instrument which appears to have been made by another without that person's consent.

**6.**

While the term alter is not defined by the forgery statute, alteration is defined in the Uniform Commercial Code as (1) an unauthorized change in an instrument that purports to modify in any respect the obligation of a party or (2) an unauthorized addition of words or numbers or other change to an incomplete instrument relating to the obligation of a party. K.S.A. 84-3-407(a).

**7.**

Altering a written instrument is not an element of making false information.

Appeal from Johnson District Court; JAMES FRANKLIN DAVIS, judge. Opinion filed April 22, 2016. Reversed.

*Allie J. Prester*, legal intern, and *Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Jacob M. Gontesky*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., HILL and POWELL, JJ.

POWELL, J.:  Christopher R. Ward appeals his convictions of theft by deception and making false information by making four arguments on appeal:  (1) The State failed to present sufficient evidence to support his crimes of conviction; (2) his constitutional right to a jury trial was infringed when the judge orally instructed the jury that it "must" find the defendant guilty if it had no reasonable doubt as to the truth of any of the State's claims; (3) he was denied his right to a fair trial when the prosecution mentioned an adult store and the district court failed to mitigate the resulting prejudice; and (4) cumulative errors deprived him of a fair trial.

After reviewing the record, we find there was insufficient evidence to convict Ward of theft by deception as the named victims were not induced by Ward's fraud and for making false information because Ward altered a check written by another. We therefore reverse his convictions.

FACTUAL AND PROCEDURAL BACKGROUND

In April 2010, Andrew Rhodes and Ward formed a construction company partnership called All Construction Guaranteed Roofing & Restoration (ACG) in which they operated as general contractors. In this role, Rhodes and Ward purchased and supplied the materials and hired subcontractors to complete the work. Once a project was

3

concluded, ACG paid the invoices for materials and paid the subcontractors for their work.

Rhodes and Ward lacked a written business agreement and orally agreed to evenly split the profits of their enterprise. They incorporated ACG and opened a business checking account to which they were both authorized signers. Rhodes and Ward did not pay themselves a regular salary but, rather, would periodically review the account and determine the amount of profit that had been generated by a given job before splitting that profit. Additionally, when one partner required funds for a particular personal expense, a check for the expense would be drafted from the business account and the other partner would also receive a check from the account in the same amount.

From 2010 to 2011, ACG was profitable. However, by 2012, due to disorganized accounting practices and less opportunities to conduct business, ACG was near bankruptcy. Rhodes and Ward, in an effort to keep ACG in business, contracted to perform a large repair and painting job on Barrington Park Estates—a large complex of 4- and 8-plexes. ACG was to be paid for its work in installments; however, ACG's subcontractors insisted on payment immediately upon completing their work. As a result, ACG did not have sufficient funds on hand to complete the contract.

This prompted Ward to suggest a meeting with Orin Sweeney, a business acquaintance of his and owner of Night & Day Remodeling, to request a capital investment. Rhodes, although unacquainted with Sweeney, agreed, and Ward met with Sweeney in May 2012. Following the meeting, Ward informed Rhodes that Sweeney was willing to partner with ACG on the Barrington Park Estates contract by offering an infusion of money, so long as ACG was willing to pay back the loaned money plus remit to Sweeney $15,000 of the contract's profit. Rhodes agreed.

4

Sweeney testified that when ACG ran into cash-flow problems, Ward approached him in order to work out a mutually beneficial agreement whereby Sweeney would provide the money to allow ACG to complete its Barrington Park Estates project. After assessing the project's profitability, Sweeney decided to participate. On May 21, 2012, he and Ward negotiated an agreement and attempted to memorialize it in a writing signed by both men. Rhodes was neither present for the contract negotiation, nor did he sign the contract. The written agreement contained multiple iterations of conflicting terms, some typewritten and others handwritten. The final iteration of contract terms represented that Sweeney would provide $20,000 to fund the remainder of the Barrington Park Estates project. ACG would then receive the next $17,000 in profits (presumably in order to fund the remainder of the project). In exchange for the $20,000, the contract provided that Sweeney would recoup his original investment plus $15,000 from the project's profits after ACG received its $17,000 from the profits. Any surplus profit thereafter would belong to ACG.

Thus, Sweeney wrote a check for $20,000 to ACG. According to Sweeney's testimony, Ward requested that Sweeney make the check out to ACG "or Chris Ward." However, Sweeney declined to add Ward's name to the check's payee line because his agreement was with ACG, not Ward as an individual.

In June 2012, after failing to receive payments as promised, Sweeney contacted Rhodes to garner ACG's performance of the contract terms. Ward was out of town at the time. During their conversation, Sweeney disclosed the $20,000 check he had paid to ACG, but Rhodes discovered the check had never been deposited into ACG's business account. When Rhodes contacted Ward by telephone to discuss the matter, Ward said he was busy and could not help resolve the discrepancy. Rhodes and Sweeney decided to file police reports.

Upon closer review of his records, Sweeney discovered that the $20,000 check he had written on his Bank of America business account with "ACG Restoration" on the payee line and provided to Ward on May 22, 2012, had been altered to include "or Chris Ward" on the payee line. Further, the check had been deposited into Ward's personal account at First National Bank instead of ACG's business account.

Rhodes did not speak to Ward again until November 22, 2012. During their conversation over the telephone, Ward apologized to Rhodes for "everything." Meanwhile, Rhodes and Sweeney came to a new agreement that allowed ACG to conclude the Barrington Park Estates project. Sweeney was eventually able to recover the original $20,000 when Sweeney's bank—Bank of America—returned the funds to Sweeney's account following a fraud affidavit filed by Sweeney.

At trial, Ward's interpretation of the contract between Sweeney and ACG diverged from Rhode's and Sweeney's versions. Ward testified that he and Sweeney originally agreed that Sweeney would provide a total of $45,000 in assistance for the Barrington Park Estates project: $22,500 of which Ward would receive immediately and a subsequent $22,500 that would eventually go to Rhodes. After further negotiation, Ward was to immediately receive $20,000 from Sweeney, Rhodes was to receive a total of $20,000 from the profits of the Barrington Park Estates project, and Sweeney was then to receive the remainder of the profits from the Barrington Park Estates project. Thus, according to Ward, he did not inappropriately deposit the money. When asked what he did with the $20,000 he obtained from Sweeney, Ward testified that he took it to a casino to gamble in an attempt to keep ACG in business. He also admitted that he added "or Chris Ward" to the payee line of the check in order to deposit the check into his personal account at First National Bank, an act he deemed "endorsing" the check.

On cross-examination, the State asked Ward about the entries on his personal checking account statement around the time of the $20,000 deposit, including the

multiple debits from an ATM inside a casino. During the exchange, the State turned its attention to another entry on Ward's account statement and asked, "What is Cirillo's?" The district court sustained defense counsel's immediate objection. The defense, out of the presence of the jury, then moved for a mistrial on the basis that the reference to a "porn shop" was impermissibly prejudicial to Ward. The district court ordered the State to "stay away from that." In response, the State reverted to asking about Ward's casino ATM withdrawals.

The State had charged Ward with one count of theft by deception, see K.S.A. 2015 Supp. 21-5801(a)(2), and one count of making false information, see K.S.A. 2015 Supp. 21-5824. The State's complaint listed "ACG Restoration or Bank of America" as the victims of Ward's alleged theft by deception, and the jury was instructed accordingly. The jury convicted Ward as charged; the district court sentenced him to 30 months in prison and ordered restitution to First National Bank in the amount of $20,000.

Ward now appeals his convictions.

DID THE STATE PRESENT SUFFICIENT EVIDENCE
TO SUPPORT WARD'S CRIMES OF CONVICTION?

Ward submits three arguments in support of his larger contention that the State produced evidence insufficient for the jury to convict him of the crimes charged. First, he argues the State presented insufficient evidence for the jury to convict him of theft by deception. Second, as part of his attack against his theft by deception conviction, Ward argues it was legally impossible for him to commit theft of partnership property because he coowned said property alongside his partner. Third, he argues the State presented insufficient evidence for the jury to convict him of making false information.

7

When the sufficiency of evidence is challenged in a criminal case, we review all the evidence in the light most favorable to the prosecution; the conviction will be upheld if the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt based on that evidence. *State v. Williams*, 299 Kan. 509, 525, 324 P.3d 1078 (2014).

A. *Did the State present sufficient evidence for a jury to convict Ward of theft by deception?*

Ward contends the State provided insufficient evidence for a jury to convict him of theft by deception because the facts, taken in the light most favorable to the State, could not support a conviction of theft of ACG's or Bank of America's property. Rather, Ward argues the evidence presented could only support a conviction of theft by deception of First National Bank's property because the only entity literally deceived by Ward's misrepresentation was First National Bank.

The State charged that Ward obtained $20,000 from ACG or Bank of America through a theft by deception, and the jury was correspondingly instructed. The crime of theft by deception is derived from K.S.A. 2015 Supp. 21-5801(a)(2): "(a) Theft is any of the following acts done with intent to permanently deprive the owner of the possession, use or benefit of the owner's property or services: . . . (2) obtaining control over property or services, by deception." Here, in order to prove theft by deception *according to the complaint*, the State was required to prove (1) that Ward obtained control over property by means of a false statement or misrepresentation, (2) that the false statement or misrepresentation deceived ACG or Bank of America, and (3) that ACG or Bank of America in whole or in part relied upon the false statement in relinquishing control of the property. See *State v. Rios*, 246 Kan. 517, 526-27, 792 P.2d 1065 (1990).

8

In Kansas, the victim must be deceived by the defendant in order to support a conviction for theft by deception. See K.S.A. 2015 Supp. 21-5801(a)(2). In *State v. Finch*, 223 Kan. 398, 573 P.2d 1048 (1978), the defendant was charged with theft by deception after purchasing clothing with a switched price tag. However, the Kansas Supreme Court reversed the conviction because the cashier was aware that the defendant switched the price tags and was directed nevertheless to allow the defendant to complete the transaction in order to catch the defendant in the act. 223 Kan. at 398-99, 404. Finch's misrepresentation did not deceive the victim and induce the victim to relinquish control of the property, rendering a conviction of theft by deception impossible.

Our Supreme Court recently reiterated this concept in *State v. Laborde*, 303 Kan. 1, 6, 360 P.3d 1080 (2015):

> "Theft by deception demands a specific kind of proof from the State. The statutory language demonstrates clearly that the legislature intended to require the State to prove that the intended victim 'was actually deceived and actually relied upon the false representation in order for the defendant to be found guilty of theft by deception.' [Citation omitted.]"

Therefore, the essential question is whether ACG or Bank of America, the victims listed on the State's charging document and the victims as instructed to the jury, actually relied on Ward's false representation and relinquished control of the $20,000 in reliance on Ward's false representation. If this is not so, Ward's theft by deception conviction cannot stand.

First, ACG was not induced into relinquishing control of the $20,000 as a result of Ward's false representation. Although ACG was contractually conditioned to receive $20,000 from Sweeney, ACG was not itself in possession of the money at the time Ward altered Sweeney's check and presented it to First National Bank. Moreover, ACG was not deceived by Ward's alteration of Sweeney's check as it neither had the opportunity to

9

inspect nor to be fooled by the altered check. In fact, Rhodes was unaware that Sweeney's check had not reached its intended destination until weeks later. As such, the elements of theft by deception are not supported by the evidence in the record with ACG as the victim.

Second, the State argues that when Sweeney's check drawn on a Bank of America account was presented for deposit, it was altered in a manner that was intended to deceive Bank of America into honoring the check and transferring the funds from Sweeney's business account at Bank of America into Ward's personal account at First National Bank. Thus, a rational jury could find that Ward deceived Bank of America.

We disagree because such a jury could not find that Bank of America relied on the deception to transfer possession of its property to Ward. Under the Uniform Commercial Code (UCC), K.S.A. 84-1-101 *et seq.*, Bank of America—as the payor bank—was induced to honor First National Bank's demand for payment under the transfer warranties contained in the UCC, not because of any misrepresentations made by Ward. See K.S.A. 2015 Supp. 84-4-207(a)(3) (collecting bank warrants check not altered); K.S.A. 84-4-105(3) ("'Payor bank' means a bank that is the drawee of a draft"); see also 11 Am. Jur. 2d, Banks and Financial Institutions § 909, p. 44 (collecting bank which indorses check guarantees authenticity).

Put another way, it was actually First National Bank's property that was transferred to Ward's possession through his deception. First National Bank, as the collecting bank that honored the fraudulent check, sought reimbursement from Bank of America as the payor bank; Bank of America paid because First National Bank warranted that the check was authentic. This fact becomes clearer after considering that once Sweeney discovered the fraud, he eventually recovered his $20,000 from Bank of America, which in turn recovered its $20,000 from First National Bank. See 11 Am. Jur. 2d, Banks and Financial Institutions § 909, p. 44 (if prior indorsement a forgery,

10

collecting bank liable to drawee bank for money paid to it by such bank). Indeed, as part of his sentence Ward was ordered to pay $20,000 in restitution to First National Bank because, after the transfers were unwound, it was First National Bank that was left without its property.

In sum, although the evidence presented in the case supports a conviction for theft by deception of First National Bank's property, the State did not name First National Bank as the victim in its complaint, and the jury was not instructed to convict should it decide that Ward obtained the $20,000 from First National Bank through deception. Because the State incorrectly named ACG and Bank of America as victims in its complaint and the jury was instructed accordingly, we must reverse Ward's conviction of theft by deception. Because we have reversed Ward's theft conviction, we need not address his second contention that, as a matter of law, he could not commit theft of partnership property.

B. *Did the State present sufficient evidence for a jury to convict Ward of making false information?*

Ward also argues the State provided insufficient evidence to support his conviction for making false information as defined by K.S.A. 2015 Supp. 21-5824(a). Assuming the State's factual allegations are true, Ward specifically contends the crime committed was forgery, arguing that his acts constituted the altering of a written instrument. The State responds that because the false instrument concerned Ward's own affairs, he was properly convicted of making false information. Resolving this issue requires us to interpret both the forgery and making false information statutes, and our review is unlimited as interpretation of a statute is a question of law. *State v. Eddy*, 299 Kan. 29, 32, 321 P.3d 12, *cert. denied* 135 S. Ct. 91 (2014).

11

The State observes, and we agree, that a treatise could be written on the foggy delineation between forgery and making false information in Kansas. See *State v. Greathouse*, No. 110,344, 2014 WL 6775814, at *2 (Kan. App. 2014) (unpublished opinion) (distinction between forgery and making false information source of some confusion). We will attempt to clear the fog by starting from the beginning.

K.S.A. 2015 Supp. 21-5824(a) defines making false information as

"making, generating, distributing or drawing, or causing to be made, generated, distributed or drawn, any written instrument, electronic data or entry in a book of account with knowledge that such information falsely states or represents some material matter or is not what it purports to be, and with intent to defraud, obstruct the detection of a theft or felony offense or induce official action."

Meanwhile, K.S.A. 2015 Supp. 21-5823(a)(1) defines forgery:

"(a) Forgery is, with intent to defraud:
(1) Making, altering or endorsing any written instrument in such manner that it purports to have been made, altered or endorsed by another person, either real or fictitious, and if a real person without the authority of such person; or altering any written instrument in such manner that it purports to have been made at another time or with different provisions without the authority of the maker thereof; or making, altering or endorsing any written instrument in such manner that it purports to have been made, altered or endorsed with the authority of one who did not give such authority."

In order to convict a defendant of making false information, the State must prove (1) the defendant knowingly made, generated, or distributed a written instrument; (2) the defendant knew the instrument to be false; and (3) the defendant had the intent to defraud, obstruct the detection of a felony, or induce official action. See K.S.A. 2015 Supp. 21-5824(a); *State v. Gotti*, 273 Kan. 459, 461, 43 P.3d 812 (2002). Under the forgery statute, the State must prove (1) the defendant knowingly made, altered, or

12

endorsed a written instrument; (2) the writing appeared to have been made by another person; and (3) the writing was made with the intent to defraud. See K.S.A. 2015 Supp. 21-5823(a)(1); *Gotti*, 273 Kan. at 461-62.

In *Rios*, 246 Kan. 517, our Supreme Court first addressed the distinction between making a false writing (now called making false information) and forgery. There, the State charged the defendants with making a false writing because they produced bogus refund vouchers purportedly on behalf of customers in order to obtain cash. Our Supreme Court held that although the definitions of making a false writing and forgery were similar, the two crimes were distinct and the principal factor distinguishing the two was that forgery involved "the making of an instrument which appears to have been made by another without that person's consent." 246 Kan. at 529. In reversing the defendants' convictions, the court created a bright-line distinction between making a false writing and forgery that declared the specific conduct described in our forgery statute, K.S.A. 21-3710—now recodified as K.S.A. 2015 Supp. 21-5823 ("purports to have been made, altered or endorsed by another person")—to constitute forgery and only forgery. 246 Kan. at 529-30.

In its discussion on the distinction between forgery and making a false writing—the significance of which will become apparent later given the State's position that Ward's acts related to his own affairs—the *Rios* court recited and commented on prior instances of making a false writing:

> "Previous cases of making a false writing coming before us involved: statements in an application for a bank loan, *State v. Roberts-Reid*, 238 Kan. 788, 714 P.2d 971 (1986); statements in a false bank loan extension intended by bank officials to deceive bank examiners, *State v. Kee*, 238 Kan. 342, 711 P.2d 746 (1985); statements made on city license and sales tax registration applications, *State v. Cuezze, Houston & Faltico*, 225 Kan. 274, 589 P.2d 626 (1979); and statements in campaign finance reports, *State v. Doyen*, 224 Kan. 482, 580 P.2d 1351 (1978).

13

"In each of these cases, the charged defendant was alleged to have written or caused to be written an instrument containing false statements. *The false statements were related to the defendant's own business or affairs.*" (Emphasis added.) 246 Kan. at 528-29.

Our Supreme Court revisited this issue in *Gotti*, 273 Kan. at 464-65, comparing the new making false information statute, see K.S.A. 2001 Supp. 21-3711 (as amended in 1997, the successor statute to K.S.A. 21-3711 [Furse], making a false writing), to K.S.A. 21-3710, the prior forgery statute. In *Gotti*, the defendant produced phony retail receipts purportedly initiated by another employee in order to induce a retailer into giving him merchandise. Like in our case and in *Rios*, the defendant claimed he should have been charged with forgery instead. In examining this question, the *Gotti* court engaged in a lengthy discussion of *Rios*:

"*Rios* noted two problems with the application of the false writing statute to the defendants' actions: 'The first problem concerns the nature of the instruments themselves. The second concerns the intended and actual use of the instruments.' [Citation omitted.] With regard to the first concern, the court cited prior case law involving the crime of making a false writing, concluding that the prior cases involved a defendant having made a false statement *regarding his or her own affairs.* However, the convictions in *Rios* were based on the phony vouchers purportedly signed by Dillard's customers: 'In short, the vouchers were forged instruments.' [Citation omitted.] The court then quoted the forgery statute, K.S.A. 21-3710, and concluded as follows:

"'Forgery is a class E felony. Making a false writing is a class D felony. Clearly, the legislature intended that the conduct proscribed by K.S.A. 21-3711 deserves a more severe penalty than does the conduct proscribed by K.S.A. 21-3710. The State herein apparently believes it is free to elevate any forgery to the making of a false writing at whim as the latter statute includes all forgeries. We do not agree. The forgery statute specifically proscribed the making of an instrument which appears to have been made by another without that person's consent. Such other person may be real or fictitious. This is precisely what defendants are alleged to have done herein, and, hence, the conduct cannot

14

also constitute the making of a false writing contrary to K.S.A. 21-3711.' 246 Kan. at 529-30." (Emphasis added.) 273 Kan. at 462-63.

The court reversed Gotti's conviction

"based on the first of the two concerns addressed by the court in *Rios.* K.S.A. 2001 Supp. 21-3711, with regard to the first concern, requires that the making of false information be done in the writer's own name. A forgery is a writing which purports to be that of another. This case presents the same concern. The receipts purported to have been initiated by another employee . . . . However, the evidence presented to the trial court showed that the transaction was initiated by Gotti." 273 Kan. at 463-64.

Thus, the *Gotti* court reaffirmed the *Rios* court's distinction between making false information and forgery by emphasizing that a false writing constituted forgery when the writing was purportedly that of another.

However, after a discussion with regard to the second concern about intent to defraud as also discussed in *Rios*, the *Gotti* court stated:

"While the [1997] amendment to K.S.A. 21-3711 could have addressed the second concern in *Rios*, as applied to the facts of that case, the amendment did not affect the court's first concern that forgery is the 'making of an instrument which appears to have been made by another without that person's consent,' while making false information involves the *perpetrator's 'own business or affairs.'* 246 Kan. at 529." (Emphasis added.) 273 Kan. at 465.

The references by both the *Rios* and *Gotti* courts to making false information as involving the defendant's own business or affairs may have led another panel of our court to elevate the description of making false information as involving the defendant's own business or affairs to the primary distinguishing test between making false information and forgery. In *State v. Dahlke*, No. 92,755, 2006 WL 851235 (Kan. App.) (unpublished

15

opinion), *rev. denied* 282 Kan. 792 (2006), the defendant made a false check in his own name, purportedly drawn on the account of Primerica Financial Services, and cashed it at a grocery store. Dahlke was charged and convicted of making false information. Again, like in the present case, Dahlke argued he was guilty of forgery, not making false information. Despite noting that the *Gotti* court held that the defendant was not guilty of making false information because "the writing was not made in regard to the defendant's own affairs because it was made in the name of the other employee [and] a false writing must be done in the writer's own name," 273 Kan. at 464, the *Dahlke* panel upheld the defendant's making false information conviction:

> "Dahlke appears to misconstrue the legal issue as acting in one's own name when the real question is whether the false statements are related to the defendant's own business or affairs. [Citation omitted.] In *Gotti* and *Rios*, the courts concluded that the statements were not related to the defendant's affairs because they were done entirely in someone else's name. However, the Primerica check was made out to Dahlke and he cashed it by presenting his own driver's license, which was recorded on the check. The claim that the check was not related to Dahlke's affairs is against reason. Therefore, Dahlke was not improperly charged." 2006 WL 851235, at *11.

We respectfully disagree. As our analysis above shows, our Supreme Court held that the defendants in both *Rios* and *Gotti* were not guilty of either making a false writing or making false information because the false instruments they created were purportedly made by another, not because the documents related or did not relate to the defendants' "own business or affairs." *Rios*, 246 Kan. at 529; see *Gotti*, 273 Kan. at 463-65. In fact, we observe that the term "own business or affairs" is not defined, nor is it contained in the elements of either forgery or making false information. Repeated holdings by our Supreme Court have stated that the plain language of the statute governs. See, *e.g.*, *State v. Phillips*, 299 Kan. 479, 495, 325 P.3d 1095 (2014). Therefore, in our view, the question *is* whether one is acting in one's own name and not "whether the false statements

16

are related to the defendant's own business or affairs." See *Dahlke*, 2006 WL 7851235, at *11.

Two other panels of our court have followed *Dahlke* down this path. In *State v. Spencer*, No. 102,339, 2010 WL 3731585 (Kan. App.) (unpublished opinion), *rev. denied* 291 Kan. 917 (2010), the defendant falsified his proof of insurance card and presented it to an employee of the local county treasurer in an effort to renew his motorcycle registration. The defendant was ultimately charged with and convicted of making false information; on appeal, the defendant argued that his conduct constituted forgery instead. The panel affirmed his conviction, stating:

> "Here, Spencer was attempting to renew the license plate on his motorcycle. In order to do so, he had to present proof that he had insurance coverage on the motorcycle. Spencer presented the County with a document in his own name that falsely stated he had insurance on his motorcycle. Although Spencer alleged the card was made by the insurance company, it was a falsification of Spencer's own insurance card in an effort to renew his license plates." 2010 WL 3731585, at *2.

Again, we disagree. Spencer was correct that his acts constituted forgery because he created a false document purportedly from his insurance company. The employee of the county treasurer's office would not have accepted any document purportedly made by the defendant and would have renewed Spencer's motorcycle registration only because of the credibility of a document purportedly from the insurance company. That was the essence of the fraud, and that was forgery according to *Rios* and *Gotti*.

In *State v. Odegbaro*, No. 108,493, 2014 WL 2589707 (Kan. App. 2014) (unpublished opinion), *rev. denied* 302 Kan. ___ (June 29, 2015), the error, in our view, is the same. There, one of the conditions of Odegbaro's probation was that she maintain full-time employment. To enforce this requirement, her probation officer required that she submit pay stubs at each of their monthly meetings. Odegbaro represented to her

17

probation officer that she was both an employee and part-owner of a company called Cokeza Styles and subsequently provided pay stubs and a paycheck, listing her as the payee and signed by Michael Bassey, all of which were purportedly from Cokeza Styles. After an investigation revealed that Odegbaro had been receiving unemployment benefits during the time she was supposedly working for Cokeza Styles, she was charged and convicted of multiple counts of making false information. As in the other cases, Odegbaro asserted on appeal that she was guilty of forgery, not making false information, because each of the documents she submitted appeared to be made by someone other than her. Relying on *Dahlke* and *Spencer*, in addition to quoting from *Gotti*, 273 Kan. at 465, that "making false information involves the perpetrator's own business or affairs," the panel held that since Odegbaro "acted to further her own business affairs," her actions constituted making false information. *Odegbaro*, 2014 WL 2589707, at *4. However, like in *Spencer*, the essence of the fraud was that the documents Odegbaro gave to her probation officer had the air of authenticity because they were purportedly made by another—the defendant's fictitious employer—which allowed Odegbaro to escape (temporarily) the consequences of being unemployed contrary to the conditions of her probation. Her actions constituted forgery for that reason.

Even when viewing the evidence in the light most favorable to the State, Ward's addition of "or Chris Ward" to the payee line of the check written by Sweeney creates a false instrument purportedly made by another with the intent to defraud. Such an act constitutes forgery, not making false information. See K.S.A. 2015 Supp. 21-5823(a)(1); K.S.A. 2015 Supp. 21-5824(a).

Finally, buttressing our conclusion today is Ward's assertion that the written instrument in this case, the check written by Sweeney, was not made by Ward but was instead altered by him. We agree. K.S.A. 2015 Supp. 21-5823(a)(1) includes altering a written instrument as an element of forgery. However, altering a written instrument is not an element of making false information. While the term "alter" is not defined by the

18

forgery statute, "alteration" is defined in the UCC as "(1) an unauthorized change in an instrument that purports to modify in any respect the obligation of a party, or (2) an unauthorized addition of words or numbers or other change to an incomplete instrument relating to the obligation of a party." K.S.A. 84-3-407(a); see also Black's Law Dictionary 94 (10th ed. 2014) ("An act done to an instrument, after its execution, whereby its meaning or language is changed; esp., the changing of a term in a negotiable instrument without the consent of all parties to it."). That is exactly what happened here. Ward altered the check written by Sweeney by adding his own name to the payee line in order to allow him to deposit the funds into his personal account. Again, that act is forgery, not making false information. Accordingly, we must reverse Ward's conviction of making false information.

We recognize that our decision likely is frustrating to those charged with enforcing the laws of our state given our change in direction with regard to the proper standard to be used in distinguishing making false information from forgery, and we fully appreciate the fact that their charging decisions in this case and others were no doubt in reliance on the prior decisions of our court. But we cannot follow other panels of our court where in our considered judgment they are in error. See *State v. Urban*, 291 Kan. 214, 223, 239 P.3d 837 (2010) (one Court of Appeals panel not bound by another); *Uhlmann v. Richardson*, 48 Kan. App. 2d 1, 13, 287 P.3d 287 (2012) ("While we must carefully consider each precedent cited to us, we also must uphold our duty to correctly determine the law in each case that comes before us. In doing so, we sometimes find that we must respectfully disagree with the opinion of another panel."), *rev. denied* 298 Kan. 1208 (2013).

Because we have reversed both of Ward's convictions, his other allegations of error are moot.

Reversed.

19