IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 111,640

STATE OF KANSAS,
*Appellee*,

v.

CHRISTOPHER R. WARD,
*Appellant*.

SYLLABUS BY THE COURT

1.

On the facts of this case, there was insufficient evidence to support the defendant's conviction of theft by deception; both the charging document and the instruction to the jury named two possible victims, and there was no proof that either was deceived by defendant.

2.

A defendant's conviction for making false information can be affirmed regardless of whether the criminal conduct pertains to his or her own business or affairs. Any earlier statement in or impression from *State v. Rios*, 246 Kan. 517, 792 P.2d 1065 (1990), and *State v. Gotti*, 273 Kan. 459, 463, 43 P.3d 812 (2002), to the contrary is explicitly rejected.

3.

On the facts of this case, evidence that the defendant altered the payee line of a check was insufficient to prove the defendant made false information.

1

Review of the judgment of the Court of Appeals in 52 Kan. App. 2d 663, 372 P.3d 417 (2016). Appeal from Johnson District Court; JAMES FRANKLIN DAVIS, judge. Opinion filed January 12, 2018. Judgment of the Court of Appeals reversing the district court is affirmed. Judgment of the district court is reversed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, argued the cause and *Allie J. Prester*, legal intern, was with him on the brief for appellant.

*Jacob M. Gontesky*, assistant district attorney, argued the cause, and *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: In this appeal the State challenges a Court of Appeals panel's reversal of defendant Christopher Richard Ward's convictions for theft by deception and making false information. See *State v. Ward*, 52 Kan. App. 2d 663, 372 P.3d 417 (2016). We agree with the panel that the evidence to support the convictions was insufficient and affirm its decision; our reasoning differs slightly from that of our colleagues on the Court of Appeals. Defendant is entitled to reversal of both of his convictions.

FACTUAL AND PROCEDURAL BACKGROUND

Ward and his friend Andrew Rhodes formed and operated a construction business, All Construction Guaranteed Roofing and Restoration (ACG). Their financial arrangement was a loose one. They merely orally agreed to become general contractors who would supply materials and hire subcontractors to perform work on projects. Neither had a set salary; occasionally they would estimate profits and divide them evenly.

A 2011 hailstorm in Johnson County provided plentiful work for ACG, but the next year brought fewer opportunities. ACG struggled before winning a bid for a large

2

painting project at a townhome complex, which promised a healthy profit. Still, ACG's cash flow was insufficient, and Ward told Rhodes that he would approach Orin Sweeney about a loan to the company.

Sweeney, who owned two construction businesses, would eventually testify in Ward's trial that he met with Ward and gave him a $20,000 check, Number 1073, which was made payable to "ACG Restoration." The check was drawn on Sweeney's business checking account with Bank of America. Although Ward had asked Sweeney to add Ward's name as a payee on the check, Sweeney refused.

Undeterred, Ward added "or Chris Ward" on the payee line of the check after leaving the meeting with Sweeney. Later the same day he deposited the check into his personal account at First National Bank.

Rhodes did not learn of the check until weeks later, when Sweeney, unsuccessful in contacting Ward, turned to Rhodes to obtain repayment of the loan. When Sweeney discovered that Ward had added his name as an alternative payee of the check, he reported Ward's actions to law enforcement.

As a result, the State charged Ward with two counts:

"COUNT I: That on or about the 22nd day of May, 2012, . . . CHRISTOPHER RICHARD WARD did . . . obtain control over property or services by deception, to-wit: cash, with the intention to permanently deprive the owner, to-wit: ACG Restoration or Bank of America of the possession, use or benefit of the property, . . . in violation of K.S.A. 21-5801, K.S.A. 21-6804 and K.S.A. 21-6807. (theft)

"COUNT II: Further, that on or about the 22nd day of May, 2012, . . . CHRISTOPHER RICHARD WARD did . . . with intent to defraud make a written instrument to-wit: check

3

#1073, with knowledge that such information falsely states some material matter or is not what it purports to be, . . . in violation of K.S.A. 21-5824, K.S.A. 21-6804, and K.S.A. 21-6807. (making []false information)"

During opening statements at trial, Ward's counsel introduced the defense theory that Ward had sold the entire apartment complex project to Sweeney and that the $20,000 was to be Ward's share of profit from the sale. In short, according to Ward, he had not done anything more than claim his ultimate due early in the transaction.

The testimony of Sweeney and Rhodes did not support Ward's version of events.

Sweeney testified that Ward arrived for their meeting with a preliminary handwritten loan agreement. The agreement included a signature purporting to be that of Rhodes. Sweeney refused to sign the agreement but, after some negotiation, assented to making the $20,000 loan to ACG. According to Sweeney, ACG would keep the next two payments from the project on the complex; then all future payments would go to Sweeney's company. Sweeney's company would also receive $15,000 of the realized profit once ACG completed the project, leaving any remaining profit for ACG. Sweeney was clear—he intended only to provide temporary financial backing. Bank of America reimbursed Sweeney $20,000 when it was alerted to Ward's alteration of the payee line on the check.

Rhodes testified that Ward insisted on meeting with Sweeney alone, because Rhodes and Sweeney had not previously been acquainted. Rhodes' understanding of the agreement between Sweeney and ACG was substantially similar to that of Sweeney. Rhodes testified that shortly after Ward's meeting with Sweeney, Ward told him Sweeney had agreed to help ACG for $15,000 of the profit from the project, but ACG would finish the project. Ward said nothing about Sweeney's $20,000 check. Rhodes denied signing

4

the preliminary handwritten loan agreement Ward had presented to Sweeney. He also testified that Ward left town sometime after meeting with Sweeney.

A representative from First National Bank testified that Ward would not have been permitted to deposit Sweeney's check into his personal account but for the presence of "or Chris Ward" on the payee line. The representative also said Ward had called the bank the day he deposited the check to try to get immediate access to the cash, which was refused. First National Bank eventually reimbursed Bank of America for the amount Bank of America reimbursed Sweeney.

The State also introduced Ward's personal bank statements into evidence; they revealed that, in the days before his meeting with Sweeney, Ward withdrew substantial sums of money through ATMs at local casinos. Moreover, his personal account was overdrawn in the days before he met with Sweeney. As soon as Sweeney's check cleared, Ward again made numerous withdrawals through ATMs at local casinos.

The State did not call a representative from Bank of America to testify, but check Number 1073 was introduced into evidence.

In addition to testifying to his understanding of the deal, as outlined in his counsel's opening statement, Ward acknowledged before the jury that Sweeney had declined his request to add his name to the payee line of the check. Ward admitted that he had added his name but said Sweeney knew he had done so.

The judge gave the following jury instruction for the theft by deception charge:

"The defendant is charged in Count 1 with the crime of theft. The defendant pleads not guilty. To establish this charge, each of the following claims must be proved:

5

"1. That ACG Restoration or Bank of America was the owner of the property;

"2. That the defendant obtained control over the property by means of a false statement or representation which deceived ACG Restoration or Bank of America who had relied in whole or in part upon the false representation or statement of the defendant;

"3. That the defendant intended to deprive ACG Restoration or Bank of America permanently of the possession, use or benefit of the property;

"4. That the value of the property was at least $1,000 but less than $25,000; and

"5. That this act occurred on or about the 22nd day of May, 2012, in Johnson County, Kansas."

After conviction on both counts, Ward was given a total sentence of 30 months in prison and was ordered to pay $20,000 in restitution to First National Bank.

On appeal, Ward argued that the evidence of theft by deception was insufficient, and that the State proved the crime of forgery rather than making false information, compelling reversal of both convictions. He also raised an instruction issue, challenged the denial of a defense motion for mistrial, and argued that cumulative error required reversal.

The Court of Appeals panel ruled that Ward had not "deceived" either "owner" identified by the State in its complaint—Bank of America or ACG—which meant that the evidence of theft by deception was insufficient. It also agreed with Ward that his conduct satisfied the elements of forgery rather than making a false information. The panel therefore reversed both convictions. *State v. Ward*, 52 Kan. App. 2d 663, 677-78, 372 P.3d 417 (2016).

When sufficiency of the evidence is challenged in a criminal case, we view the evidence in the light most favorable to the prosecution and determine whether we are convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. If so, we affirm; if not, we reverse. On the way to the outcome, we "do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations." *State v. Qualls*, 297 Kan. 61, 66, 298 P.3d 311 (2013).

Ward was convicted of theft by deception from ACG or Bank of America. In Kansas theft by deception is defined as: "[W]ith intent to permanently deprive the owner of the possession, use or benefit of the owner's property or services . . . obtaining control over property or services, by deception." K.S.A. 2016 Supp. 21-5801(a)(2). Under this definition, we have consistently required the State to present evidence that the person relinquishing control of the property "'was actually deceived and actually relied upon the false representation in order for the defendant to be found guilty . . . .' *State v. Finch*, 223 Kan. 398, 402, 573 P.2d 1048 (1978)." *State v. Laborde*, 303 Kan. 1, 6, 360 P.3d 1080 (2015).

Based on the State's charge and the district judge's jury instruction, in order for us to affirm Ward's conviction, we must see sufficient evidence in the record that (1) either ACG or Bank of America was an owner of the $20,000, (2) Ward obtained control over $20,000 by means of a false statement or representation, (3) the false statement deceived either ACG or Bank of America, which relied upon the deception, and (4) Ward intended to deprive ACG or Bank of America permanently of the $20,000. See PIK Crim. 4th 58.010.

The Legislature has defined certain terms used in the theft statute. An "owner" is "a person who has any interest in property." K.S.A. 2012 Supp. 21-5111(s). And "deception" "means knowingly creating or reinforcing a false impression, including false impressions as to law, value, intention or other state of mind." K.S.A. 2012 Supp. 21-5111(e). We also note that Black's Law Dictionary identifies an "interest" in property as "a legal share in something; all or part of a legal or equitable claim to or right in property." Black's Law Dictionary 934 (10th ed. 2014).

We agree with the Court of Appeals that the State presented insufficient evidence on deception of and reliance by ACG. ACG qualified as an owner because it had an interest in the $20,000 based on its status as the intended payee of Sweeney's check, and Ward was acting as an agent of ACG when he accepted the check from Sweeney. But "ACG was not deceived by Ward's alteration of Sweeney's check as it neither had the opportunity to inspect nor to be fooled by the altered check." *Ward*, 52 Kan. App. 2d at 670. Instead, from the time the check was given to Ward until he deposited it in his personal account at First National Bank, he remained the only person affiliated with ACG who knew of the check's existence or of its original or altered state. In vintage cinema parlance, Ward pulled "an inside job," an embezzlement of company funds. See K.S.A. 2016 Supp. 21-5801(a)(1). His insider status put him in position to take possession of ACG's check, alter its payee line, and then exert unauthorized control over it by depositing it into his personal account—while everyone else at the company remained none the wiser. In essence, Ward stepped out of his role as loyal company agent and into a role acting as himself for only himself. He could not deceive himself.

We also agree with the Court of Appeals that the State presented insufficient evidence on deception of and reliance by Bank of America, although we do not rely on its rationale that Bank of America cashed the check presented by First National Bank in reliance on Uniform Commercial Code transfer warranties. See *Ward*, 52 Kan. App. 2d at

8

670. Rather, the evidence as to theft by deception from Bank of America fails as a matter of law because Ward did not deceive that bank. Ward presented the check to his own bank, First National, and, as one of the bank's representatives testified, it would not have allowed Ward to deposit the check in his personal account but for his addition of "or Chris Ward" to the payee line. Bank of America then honored the check when it was presented by First National Bank because Bank of America's depositor, Sweeney, had signed it. The signature line was the line on the check upon which Bank of America relied, not the altered payee line. While First National Bank undoubtedly was deceived by Ward's actions, Bank of America was not.

For the foregoing reasons, the State did not prove that Ward committed theft by deception of ACG or Bank of America, and we affirm the Court of Appeals panel's reversal of his conviction on that count of the complaint.

SUFFICIENCY OF THE EVIDENCE OF MAKING FALSE INFORMATION

The State next defends Ward's conviction for making false information, arguing that there was sufficient evidence for the jury to find Ward guilty under K.S.A. 2016 Supp. 21-5824.

The parties' arguments are predicated on statutory interpretation of the making false information and forgery statutes. "'Issues of statutory interpretation and construction . . . raise questions of law reviewable de novo on appeal.'" *State v. Brown*, 295 Kan. 181, 193-94, 284 P.3d 977 (2012). Once that interpretation is accomplished, we again are called upon to review the sufficiency of the State's evidence; our standard of review is the same as that set out above with regard to theft by deception.

The controlling making false information statute requires:

9

"making, generating, distributing or drawing, or causing to be made, generated, distributed or drawn, any written instrument, electronic data or entry in a book of account with knowledge that such information falsely states or represents some material matter or is not what it purports to be, and with intent to defraud, obstruct the detection of a theft or felony offense or induce official action." K.S.A. 2016 Supp. 21-5824(a).

The forgery statute in effect at the time of Ward's conduct read in pertinent part:

"Forgery is, with intent to defraud:

"(1) Making, altering or endorsing any written instrument in such manner that it purports to have been made, altered or endorsed by another person, either real or fictitious, and if a real person without the authority of such person; or altering any written instrument in such manner that it purports to have been made at another time or with different provisions without the authority of the maker thereof; or making, altering or endorsing any written instrument in such manner that it purports to have been made, altered or endorsed with the authority of one who did not give such authority." K.S.A. 2016 Supp. 21-5823(a).

The State argues, relying on earlier caselaw, that Ward's conduct in adding his name to the payee line of Sweeney's check involved his own "business or affairs" and therefore legally constituted only making false information and not forgery. Ward has also focused on distinguishing making false information and forgery, insisting that the State may have had a sufficient case for forgery but not for making false information.

We begin our analysis with a brief recitation of the statutory history.

Nearly a century ago, the legislature defined offenses affecting records, currency, written instruments, and securities in Chapter 21, Article 6 of the 1923 General Statutes.

10

Those statutes, G.S. 1923, 21-601 through 21-637, proscribed a variety of conduct. Although they set out degrees of forgery, there was no crime called "making false information," or its eventual predecessor, "making a false writing." See K.S.A. 1970 Supp. 21-3711. But the historical statutes are correctly listed as sources for modern versions of both the making false information and the forgery statutes, because some of the modern language now found in K.S.A. 2016 Supp. 21-5824 and K.S.A. 2016 Supp. 21-5823 can also be found in G.S. 1923, 21-601 through 21-637 from 1923.

For example, two of the historical statutes, G.S. 1923, 21-604 and 21-605, defined second-degree forgery:

> "Every person who, with intent to defraud, shall falsely make, alter, destroy, corrupt or falsify, or procure to be falsely made, altered, destroyed, corrupted or falsified—*First*, any record of any will, conveyance or other instrument, the record or the copy of the record of which by law shall be evidence; or, *second*, any record of any judgment or decree of any court of record; or, *third*, any entry in any book, record, journal or account book, required or authorized by the laws of this state to be kept in any country, township or school-district clerk, or other public officer, or by any officer of this state, or of any county or other municipal corporation, or school district; or *fourth*, the return of any officer, court or tribunal to any order, writ or process of any court, shall upon conviction be adjudged guilty of forgery in the second degree. [G.S. 1923, 21-604.]

> . . . .

> ". . . Every person who shall falsely make, forge or alter, or cause or procure to be falsely made, forged or altered, any entry in any book of records, or any instrument purporting to be any record or return, specified in the last section, with intent to defraud, shall upon conviction be adjudged guilty of forgery in the second degree. [G.S. 1923, 21-605.]"

Both statutes covered alteration, the specific conduct in which Ward engaged. But alteration language is included only in the modern forgery statute.

Many other of the 1923 statutes include language that the prohibited conduct is conduct that "purport[s]" to be something other than what it actually is, such as "to be the act of another" (G.S. 1923, 21-601); "to have been issued under the authority of this state" (G.S. 1923, 21-602); and "to be the impression of [a] seal" (G.S. 1923, 21-603). These statutes that criminalized a masquerade of some type evolved into the modern-day forgery statute, and the behavior they criminalized was consistent with that criminalized by today's forgery statute.

Other sources of prior law for the modern crime of making false information include portions of the chapter regulating grain and forage and sections of the tax code. See L. 1967, ch. 237, § 3 (history of K.S.A. 1968 Supp. 34-295c: creating felony for keeping false grain storage records); L. 1949, ch. 242, § 61 (history of G.S. 1949, 41-509: criminalizing making or possessing false tax stamps); L. 1930, ch. 14, § 2 (history of G.S. 1935, 79-316a: criminalizing making false personal property records for taxation purposes); L. 1933, ch. 122, § 17 (Special Session) (history of G.S. 1935, 79-3320: criminalizing, with intent to defraud the State, "mak[ing], alter[ing], forg[ing] . . . any license or stamp"). Again, the behavior criminalized by these statutes is similar to that criminalized by today's making false information statute. It differs from the behavior on which the forgery statute and its predecessor language have focused; it does not require that the offender masquerade as another person, only that he or she engage in the deceitful creation or presentation of inaccurate information. See K.S.A. 2016 Supp. 21-5824(a) (making false information).

When the 1969 Legislature heavily amended the criminal code, effective July 1, 1970, it repealed all of the predecessor statutes cited above—G.S. 1923, 21-604, G.S.

1923, 21-605, K.S.A. 1968 Supp. 34-295c, G.S. 1949, 41-509, G.S. 1935, 79-316a, and G.S. 1935, 79-3320. See L. 1969, ch. 180, § 21-4701. Replacement provisions included Kansas' earliest version of the statute on making a false writing—the intervening predecessor to today's making false information statute—and the modern forgery statute. See K.S.A. 1970 Supp. 21-3710 (forgery); K.S.A. 1970 Supp. 21-3711 (making a false writing).

The 1969 Legislature defined making a false writing as:

"making, drawing or keeping or causing to be made, drawn or kept any written instrument or entry in a book of account with knowledge that such writing falsely states or represents some material matter or is not what it purports to be, and with intent to defraud or induce official action." K.S.A. 1970 Supp. 21-3711.

And it defined forgery as:

"knowingly and with intent to defraud:

"(a) Making or altering any written instrument in such manner that it purports to have been made by another person or at another time or with different provisions or by authority of one who did not give such authority; or

"(b) Issuing or delivering such written instrument knowing it to have been thus made or altered; or

"(c) Possessing, with intent to issue or deliver, any such written instrument knowing it to have been thus made or altered." K.S.A. 1970 Supp. 21-3710.

In 1996, the legislature changed the making a false writing statute to a making false information statute. K.S.A. 1996 Supp. 21-3711. Since then, K.S.A. 21-3710 and

21-3711 have been periodically amended and expanded, and they were recodified as K.S.A. 2016 Supp. 21-5823 and K.S.A. 2016 Supp. 21-5824 along with the rest of the criminal code in 2010, but they cover generally the same substantive ground today.

Moving to caselaw growing out of the statutory history, the Court of Appeals panel observed in this case that "a treatise could be written on the foggy delineation between forgery and making false information in Kansas." 52 Kan. App. 2d at 671. We agree that this "foggy delineation" could support at least a respectable student-produced law review note. It has arisen over time in the context of various challenges to convictions in which the defendants have asserted that they were found guilty of the wrong offense—sometimes styled as evidence sufficiency problems, sometimes as defective charging document problems, sometimes as some sort of hybrid problems. As the following discussion illustrates, both this court and several Court of Appeals panels have been caught up in trying to draw a defensible line between the two crimes at the expense of necessary focus on the statutory elements of the charged crime and the presence or absence of evidence to support them.

The genesis of the "own business or affairs" language relied upon by the State is this court's 1990 decision in *State v. Rios*, 246 Kan. 517, 792 P.2d 1065 (1990).

In *Rios* our predecessors considered the consolidated appeals of two defendants, Richard M. Rios and William S. Johnson, who had created bogus refund vouchers to cover up their prior thefts of money from their department store employer. Based on the nature of defendants' challenge, the court evaluated whether their conduct "legally constitute[d] the making of a false writing," which was the crime of conviction, or forgery, the crime the defendants argued that they had actually committed. 246 Kan. at 528.

14

Instead of articulating a standard of review or other established legal principles to launch its analysis, the *Rios* court identified "two basic questions" it needed to answer: (1) "the nature of the instruments themselves"; and (2) "the intended and actual use of the instruments." 246 Kan. at 528. In other words, the court put its energy into categorization of defendants' conduct rather than evaluating whether the elements of the charged crime had been proved.

Addressing the first question, the court said:

"Previous cases of making a false writing coming before us involved: statements in an application for a bank loan, *State v. Roberts-Reid*, 238 Kan. 788, 714 P.2d 971 (1986); statements in a false bank loan extension intended by bank officials to deceive bank examiners, *State v. Kee*, 238 Kan. 342, 711 P.2d 746 (1985); statements made on city license and sales tax registration applications, *State v. Cuezze, Houston & Faltico*, 225 Kan. 274, 589 P.2d 626 (1979); and statements in campaign finance reports, *State v. Doyen*, 224 Kan. 482, 580 P.2d 1351 (1978)." *Rios*, 246 Kan. at 528-29.

The *Rios* court synthesized these cases to mean that a criminally actionable statement in a false writing should be "related to the defendant's own business or affairs." *Rios*, 246 Kan. at 528-29. In fact, the elements of the crime did not include such a requirement. See K.S.A. 21-3711(Ensley 1988). In contrast, the *Rios* court concluded, "the forgery statute specifically proscribed the making of an instrument *which appears to have been made by another* without that person's consent." (Emphasis added.) 246 Kan. at 529. With this comparison established, the court held that the evidence was insufficient to support the defendants' convictions of making a false writing. 246 Kan. at 531. This comparison was used as a proxy for a conventional sufficiency analysis. See, e.g., *State v. Robinson*, 306 Kan. 1012, 1022-25, 399 P.3d 194 (2017) (court evaluates whether evidence presented satisfies elements of crime); *State v. Banks*, 306 Kan. 854, 858-61, 397 P.3d 1195 (2017) (court examines evidence in support of premeditation element).

15

More than a decade later, this court compared the later making false information offense and forgery. In that case, *State v. Gotti*, 273 Kan. 459, 463, 43 P.3d 812 (2002), defendant Story L. Gotti created false refund vouchers and gave them to another person to use in defrauding Gotti's department store employer. Gotti challenged his conviction for making false information, framing the issue before the court as a defective charge.

The *Gotti* court mentioned the two questions *Rios* had set forth as central to the false writing statute and, as the court did in *Rios*, used them to guide its analysis rather than focusing on the statutory elements. It twice referred specifically to *Rios*' language about the defendant's own "business or affairs" and held that the weakness in the State's case lay in the nature of the instruments. 273 Kan. at 465. The making false information statute, the court said, "requires that the making of false information be done in the writer's own name. [And a] forgery is a writing which purports to be that of another." 273 Kan. at 464. The *Gotti* court reversed the defendant's conviction of making false information, holding that his conduct constituted forgery. 273 Kan. at 465.

The Court of Appeals panel in this case accurately and succinctly described the complications that have ensued before other panels of its court when they faced arguments similar to those advanced in *Rios* and *Gotti*:

> "The references by both the *Rios* and *Gotti* courts to making false information as involving the defendant's own business or affairs may have led another panel of our court to elevate the description of making false information as involving the defendant's own business or affairs to the primary distinguishing test between making false information and forgery. In *State v. Dahlke*, No. 92,755, 2006 WL 851235 (Kan. App.) (unpublished opinion*), rev. denied* 282 Kan. 792 (2006), the defendant made a false check in his own name, purportedly drawn on the account of Primerica Financial Services, and cashed it at a grocery store. Dahlke was charged and convicted of making false information. Again,

like in the present case, Dahlke argued he was guilty of forgery, not making false information. Despite noting that the *Gotti* court held that the defendant was not guilty of making false information because 'the writing was not made in regard to the defendant's own affairs because it was made in the name of the other employee [and] a false writing must be done in the writer's own name,' 273 Kan. at 464, the *Dahlke* panel upheld the defendant's making false information conviction:

> 'Dahlke appears to misconstrue the legal issue as acting in one's own name when the real question is whether the false statements are related to the defendant's own business or affairs. [Citation omitted.] In *Gotti* and *Rios*, the courts concluded that the statements were not related to the defendant's affairs because they were done entirely in someone else's name. However, the Primerica check was made out to Dahlke and he cashed it by presenting his own driver's license, which was recorded on the check. The claim that the check was not related to Dahlke's affairs is against reason. Therefore, Dahlke was not improperly charged. 2006 WL 851235, at *11.'

"We respectfully disagree. . . . [O]ur Supreme Court held that the defendants in both *Rios* and *Gotti* were not guilty of either making a false writing or making false information because the false instruments they created were purportedly made by another, not because the documents related or did not relate to the defendants' 'own business or affairs.' *Rios*, 246 Kan. at 529; see *Gotti*, 273 Kan. at 463-65. In fact, we observe that the term 'own business or affairs' is not defined, nor is it contained in the elements of either forgery or making false information. Repeated holdings by our Supreme Court have stated that the plain language of the statute governs. See, e.g., *State v. Phillips*, 299 Kan. 479, 495, 325 P.3d 1095 (2014). Therefore, in our view, the question is whether one is acting in one's own name and not 'whether the false statements are related to the defendant's own business or affairs.' See *Dahlke*, 2006 WL 851235, at *11.

"Two other panels of our court have followed *Dahlke* down this path. In *State v. Spencer*, No. 102,339, 2010 WL 3731585 (Kan. App.) (unpublished opinion), *rev. denied*

17

291 Kan. 917 (2010), the defendant falsified his proof of insurance card and presented it to an employee of the local county treasurer in an effort to renew his motorcycle registration. The defendant was ultimately charged with and convicted of making false information; on appeal, the defendant argued that his conduct constituted forgery instead. The panel affirmed his conviction, stating:

> 'Here, Spencer was attempting to renew the license plate on his motorcycle. In order to do so, he had to present proof that he had insurance coverage on the motorcycle. Spencer presented the County with a document in his own name that falsely stated he had insurance on his motorcycle. Although Spencer alleged the card was made by the insurance company, it was a falsification of Spencer's own insurance card in an effort to renew his license plates.' 2010 WL 3731585, at *2.

"Again, we disagree. Spencer was correct that his acts constituted forgery because he created a false document purportedly from his insurance company. The employee of the county treasurer's office would not have accepted any document purportedly made by the defendant and would have renewed Spencer's motorcycle registration only because of the credibility of a document purportedly from the insurance company. That was the essence of the fraud, and that was forgery according to *Rios* and *Gotti*.

"In *State v. Odegbaro*, No. 108,493, 2014 WL 2589707 (Kan. App. 2014) (unpublished opinion), *rev. denied* 302 Kan. 1018 (2015), the error, in our view, is the same. There, one of the conditions of Odegbaro's probation was that she maintain full-time employment. To enforce this requirement, her probation officer required that she submit pay stubs at each of their monthly meetings. Odegbaro represented to her probation officer that she was both an employee and part-owner of a company called Cokeza Styles and subsequently provided pay stubs and a paycheck, listing her as the payee and signed by Michael Bassey, all of which were purportedly from Cokeza Styles. After an investigation revealed that Odegbaro had been receiving unemployment benefits during the time she was supposedly working for Cokeza Styles, she was charged and convicted of multiple counts of making false information. As in the other cases,

18

Odegbaro asserted on appeal that she was guilty of forgery, not making false information, because each of the documents she submitted appeared to be made by someone other than her. Relying on *Dahlke* and *Spencer*, in addition to quoting from *Gotti*, 273 Kan. at 465, that 'making false information involves the perpetrator's own business or affairs,' the panel held that since Odegbaro 'acted to further her own business affairs,' her actions constituted making false information. *Odegbaro*, 2014 WL 2589707, at *4. However, like in *Spencer*, the essence of the fraud was that the documents Odegbaro gave to her probation officer had the air of authenticity because they were purportedly made by another—the defendant's fictitious employer—which allowed Odegbaro to escape (temporarily) the consequences of being unemployed contrary to the conditions of her probation. Her actions constituted forgery for that reason." 52 Kan. App. 2d at 675-77.

In another Court of Appeals case cited but not discussed by the panel in this case, *State v. Greathouse*, No. 110,344, 2014 WL 6775814 (Kan. App. 2014) (unpublished opinion), defendant Lance Greathouse had passed $60 in counterfeit cash to a correctional officer in an effort to bail a friend out of jail. The panel recognized that other appellate courts had construed the making false information statute and the forgery statute "in such a way that forgery requires a writing in the name of another while making false information is a writing in one's own name or concerning oneself." *Greathouse*, 2014 WL 6775814, at *2. It also—perhaps drolly—observed that "[t]his distinction has been the source of some confusion over the years." 2014 WL 6775814, at *2. It ultimately ruled that "the counterfeit instruments did not contain information related to the defendant's own business or concerns, nor were they made in the writer's own name. The instruments were simply counterfeit legal tender. These facts would support a conviction for forgery." 2014 WL 6775814, at *3.

Having reviewed the statutory language and the case precedent, today we return to the basics referenced by the Court of Appeals in this case. We do not customarily add language to clear statutes. See *State v. Ardry*, 295 Kan. 733, 737, 286 P.3d 207 (2012) (not function of appellate court to delete or add language to statute). And the clear

language of the making false information statute requires no such addition here. This compels us to explicitly reject any earlier statement in or impression from *Rios* and *Gotti* that a defendant's conduct must pertain to his or her own business or affairs before a conviction for making false information can be affirmed.

This directs us to the question that is the true heart of this appellate challenge by Ward: Did the State present sufficient evidence to support the actual elements of making false information, regardless of whether it could have successfully prosecuted Ward for forgery?

Again, to convict of making false information in this case, the State must have proved that: (1) Ward knowingly made a written instrument; (2) Ward knew the instrument to be false; (3) Ward had the intent to defraud; and (4) Ward obstructed the detection of a theft or felony or induced official action.

The Legislature has not defined the term "make" in this context. See K.S.A. 2016 Supp. 21-5111 (definitions). But plain words should be given their ordinary meaning, and dictionary definitions can be good sources for such meanings. See *Midwest Crane & Rigging, LLC v. Kansas Corp. Comm'n*, 306 Kan. 845, 850, 397 P.3d 1205 (2017). Black's Law Dictionary defines "make" as "1. To cause (something) to exist <to make a record>. 2. To enact (something) <to make law>. 3. To acquire (something) <to make money on execution>. 4. To legally perform, as by executing, signing, or delivering (a document) <to make a contract>." Black's Law Dictionary 1099 (10th ed. 2014). The evidence in this case showed only that Ward altered a check already filled out in full by Sweeney. He did not "make" the check in any of the senses recognized in Black's.

In addition, the Uniform Commercial Code, which Kanas adopted in 1992, governs negotiable instruments such as checks. Although it is not directly applicable to

20

this criminal case, see *State v. Foster*, 298 Kan. 348, 357, 312 P.3d 364 (2013) ("UCC addresses unique and specialized area of the law"; its provisions "do not always translate precisely into other areas"), it offers valuable, common-sense guidance on who qualifies as the "maker" of a check. A maker is a "person who signs or is identified in a note as a person undertaking to pay." K.S.A. 2016 Supp. 84-3-103(5). Under the UCC, Sweeney was the maker of the check. Ward was merely the alterer of that check.

In short, the State failed to meet its burden to prove the first element of the crime of making false information. This conclusion eliminates the need for us to discuss whether there were shortcomings in the State's proof of the other elements of the crime. Ward's conviction of making false information must be reversed.

CONCLUSION

The judgment of the Court of Appeals is affirmed and the judgment of the district court is reversed.

21